Sigmund **HILL**

v.

Arthur S. **FLEMING,** Secretary of Health, **Education and Welfare.**

**Civ. A. No. 15447.**

United States District Court
W. D. Pennsylvania.

Dec. 23, 1958.

A copy of the transcript of the record of the proceedings before the Social Security authorities was filed and under § 205(g) the court has power to adjudicate the issues on this record and enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."

On March 25, 1955, plaintiff filed his application with the Bureau of Old Age and Survivors Insurance of the Social Security Administration for the purpose of establishing a period of total and permanent disability from November, 1945, continuing to the present time.[1] The Appeals Council found plaintiff's special earnings test "terminated at the end of the first calendar quarter of 1948". It stated that "it is necessary to evaluate the severity of claimant's disabilities prior to March 31, 1948, and determine whether or not he was 'disabled' at that time and continuing up to March 1955 when he filed his application". It was decided that plaintiff was not entitled to the period of disability for which he made application in that his "impairments were not so severe when he last met the earnings requirements in the Act, or as of the date when he filed application to establish a period of disability, to prevent him from engaging in any substantial gainful activity".

Section 205(g) of the Social Security Act, as amended, 42 U.S.C.A. § 405(g), provides:

"* * * The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * *."

Under that provision, as well as the Administrative Procedure Act, 5 U.S. C.A. § 1009, it is the duty of the court to ascertain "whether on the record as a whole there is substantial evidence to support the Secretary's findings of fact". Goldman v. Folsom, 3 Cir., 1957, 246 F.2d

J. Harry Pershing, Pittsburgh, Pa., for plaintiff.

John Gavin, First Asst. U. S. Atty., Pittsburgh, Pa., for defendant.

MARSH, District Judge.

Pursuant to § 205(g) of the Social Security Act, as amended, 42 U.S.C.A. § 405(g), plaintiff seeks a review of a decision of the Secretary of Health, Education and Welfare denying him a disability freeze under § 216(i) of the Act, as amended, 42 U.S.C.A. § 416(i). The defendant moved for summary judgment.

---

[1]. Section 416(i) (1) provides that the term "disability" means "(A) inability to engage in any substantial gainful activity by reason of any medically de- terminable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration."

776, 778. In that case the Court of Appeals stated:

"In discharging that duty we must keep in mind, as adjured by the Supreme Court, that 'courts must now assume more responsibility for the reasonableness and fairness' of decisions of federal agencies 'than some courts have shown in the past' and 'Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function.' Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456."

See also Boyd v. Folsom, 3 Cir., 1958, 257 F.2d 778, 781; Jacobson v. Folsom, D.C.S.D.N.Y.1957, 158 F.Supp. 281; Wilson v. Folsom, D.C.D.N.D.S.E.D.1957, 151 F.Supp. 195.

It is undisputed that plaintiff was born on February 23, 1896 in Hungary. He came to the United States in 1913 and worked as a machinist until November 3, 1945, when he injured his back while doing heavy work as a machine operator at Westinghouse Electric Company. In May, 1946, he attempted to resume this work but had to discontinue after four days. There is some evidence that he was reinjured.

Plaintiff says his education ended with the sixth grade in Hungary; and although he can read English, he has difficulty in writing. He married and had a large family. There is no evidence that he possessed qualifications for any type of work other than a machinist.

Plaintiff was not represented by counsel at the hearing before the Referee, and his testimony reflects that he is not very coherent and had a very limited notion of his burden of proof. However, the Referee, as well as the Appeals Council after remand on motion of the United States Attorney, aided plaintiff considerably in collecting the records of his long disability. See § 205(b), 42 U.S.C.A. § 405(b).

Plaintiff was the only witness at the hearing. None of the numerous doctors who attended him were examined, the Referee and Council being content with their written reports and certain hospital records. These medical reports cover the period from shortly after his injury in 1945 to September, 1957.

It is undisputed that during the entire period, except for the four days mentioned, plaintiff did not engage in any gainful occupation. He testified he could not do any light work, that he was in bed a great part of the time, that he had shortness of breath, continuous pain in his back and legs, limitation of motion in back and legs, and could not stand transportation in street cars and automobiles. He was able to move about and spent 5 or 10 minutes in his yard in warm weather. None of this testimony was contradicted. The Council found that plaintiff "felt like he could engage in light work", but the only evidence of that is he asked his employer for a light job to "sit at the gate". He did not get the job. Under the evidence he certainly could not have functioned competently as a policeman or guard, or even as a "gate sitter".

It is undisputed that he received medical attention immediately after his injury and almost continuously thereafter to the present time. He was in the service of Dr. Paul Steele, an eminent Pittsburgh orthopedic surgeon, from August, 1946 to July, 1949. For one month in 1947, he was hospitalized by Dr. Steele in the Allegheny General Hospital. He was studied at the Falk Clinic from January to March, 1955. He was hospitalized at St. John's Hospital for 11 days in 1956.

It is undisputed that plaintiff received workmen's compensation from December, 1945 to March, 1946 for total disability, and from August, 1946 to September, 1951 for partial disability,—300 weeks, which appears to have been the limit allowed by law.

It is undisputed that Traveler's Insurance Company paid plaintiff benefits for

total and permanent disability which wholly disabled him from engaging in any and every occupation for wage or profit. The Traveler's policy was not offered in evidence, but the Insurance Company's Medical Examiner, Dr. U. A. Carpenter, so reported plaintiff's disability on May 1, 1948 (Exhibit A.C. 2). Payments for total and permanent disability were made until the coverage ran out in 1953.

His employer sent plaintiff to Dr. Coyle[2] who saw him in December, 1945, and reported he had an acute low back sprain.

Dr. Steele, who saw plaintiff twice monthly from August, 1946, to July, 1949, reported in 1956 that plaintiff had arthritis of the spine involving the lumbar spine and sacro-iliac joints and lumbo-sacral joint; that in 1947 he hospitalized plaintiff and applied a body cast followed by orthopedic belt. It is undisputed that plaintiff still wears a back brace. The doctor's conclusions were based on X-ray reports and clinical findings of marked limitation of motion in lumbar spine. In March, 1948, Dr. Steele wrote Traveler's Insurance Company that plaintiff's disability "is total and permanent in character". He noted that he thought plaintiff "should be able to do light work at some time".

Dr. Steele was not called as a witness so it is not known whether he would now testify that his expectations were ever realized.

Dr. Steele's report of November, 1947 indicated that he had access to X-ray reports taken on August 12, 1946, and his objective findings were "motion slightly limited * * * arthritis lumbar spine and lumbo-sacral joint". He stated that plaintiff was then totally "disabled from engaging in any and every occupation at this time".

In June, 1955, Dr. W. F. Tannehill reported that plaintiff was treated for 9 years by him, Dr. Steele and Falk Clinic. He wrote:

"His condition has not improved. This man in my opinion has not been able to work during this time."

Dr. Tannehill's clinical findings were swollen right knee; he diagnosed a chronic arthritis, chronic bursitis left knee,—"condition started 9 years ago". His last examination of plaintiff was June, 1955.

In April, 1956, Dr. J. D. Sarandria reported that he first treated plaintiff in January, 1955, and weekly thereafter until February, 1956. His clinical findings based on X-rays were generalized osteoarthritis, swelling of both knee joints, shoulder joint, back and finger. His diagnosis was generalized osteoarthritis with some swelling. He stated no improvement could be expected, that there was "marked" and "complete" limitation with "some edema", and "dyspnea on slight exertion"; that the X-ray report was osteoarthritis generalized; that "nearly all joints affected and back". Under remarks he stated: "He is hardly able to move about."

On September 27, 1957, Dr. Sarandria certified that plaintiff had been under his care for the past two years "and his condition is such that he is totally unable to do any form of manuel [sic] labor, is hardly able to get around."

In March, 1947, Dr. J. Huber Wagner, an eminent Pittsburgh surgeon, known to the court to have been for many years chief surgeon for the United States Steel Corporation, reported that he noticed plaintiff to be "rather short of breath * * * forward flexion is markedly limited with marked muscle spasm over the erector spinous group of the left lumbosacral region" and pain on movement. He checked X-rays by Dr. L. P. Sheedy which were "practically negative", but observed "slight hypertrophic change involving the bodies of the 4th and 5th lumbar". He found the sacro-iliac spaces clear "and compare well with a man of his age". Nevertheless, he felt that plaintiff was suffering from a "severe

---

2. Sometimes called "Cole".

sprain of his back", that the prognosis "is not good" and "so far as his returning to work as a machinist is concerned, I think it is quite questionable". He expected that with "manipulative treatment, plus physiotherapy he *might probably* reach the position where he could do some light duty such as watchman, elevator-man or some lighter mechanical work." (Emphasis supplied.) He suggested that plaintiff continue under the care of Dr. Steele.

In May, 1947, Dr. Harry Epstein found marked limitation of motion and muscle spasm in plaintiff's back accompanied by "extreme pain". He reported the X-rays revealed expected "hypertrophic lipping" and "over the anterior superior margin of the fourth lumbar vertebra there appears to have been some tearing of this margin suggestive of a sprain fracture". He concluded plaintiff had suffered a sprain fracture "and is disabled", prognosis "poor". He reported "he may be able to do light work *but this would have to be experimented before it could be confirmed. In other words, he would have to attempt such work after extensive treatment before it could be definitely stated whether or not he would be able to do such work.*" (Emphasis supplied.)

Dr. Epstein, Dr. Wagner and Dr. Steele were not called and thus the record is barren of any testimony that plaintiff was able to do light work after hospitalization in two hospitals and a long course of persistent treatment by Dr. Steele, Dr. Sarandria and Dr. Tannehill.

Dr. H. Ryerson Decker examined plaintiff in April, 1948, and again in February, 1949. He examined Dr. Sheedy's X-rays, also X-rays by Dr. Grier. He found "limitation of bending in all directions on account of pain", but no muscle spasm. He concluded that plaintiff sustained a "severe sprain originally of his lower back involving the lower lumbar and lumbo-sacral joints from which he has not recovered. X-ray examination shows that there is a definite arthritis in the lumbar spine. *In view of the long*

*history and rest which he has had, it is my opinion that he is permanently and totally disabled.*" (Emphasis supplied.)

Dr. Decker's 1949 report confirmed that there had been no improvement after biweekly treatments under Dr. Steele. He reported: "The man is still totally disabled on account of an old lumbo-sacral back sprain and superimposed radiculitis. Basically there is hypertrophic arthritis involving the lower lumbar spine."

Notwithstanding this considerable evidence, on the basis of fragmentary statements contained in the Allegheny General Hospital record and by the Librarian of the Falk Clinic, the Council sustained the Referee's conclusion to the effect that plaintiff was able to do light work as of the date of the application. The Librarian of the Falk Clinic reported "X-ray of the spine revealed minimal osteoarthritic involvement of the lumbar spine", "no evidence of real musculoskeletal disease", "no atrophy swelling or deformity", "no hamstring spasm".

In our opinion these hearsay statements, in the light of the whole record, are not substantial evidence to negative either the plaintiff's disability or his incapacity since prior to March 31, 1948 to engage in any gainful occupation. The record as a whole leaves the conclusion of the Council and Referee on the ultimate facts without reasonable foundation. National Labor Relations Board v. Truitt Mfg. Co., 1956, 351 U.S. 149, 155, 76 S.Ct. 753, 100 L.Ed. 1027; National Labor Relations Board v. Babcock & Wilcox Co., 1956, 351 U.S. 105, 112, 76 S.Ct. 679, 100 L.Ed. 975. A finding of ultimate fact not reasonably supported by substantial evidence should be set aside. Boyd v. Folsom, supra; Cream Wipt Food Products Co. v. Federal Security Adm'r, 3 Cir., 1951, 187 F.2d 789.

The medical evidence was unimpeached. No doctor stated that plaintiff at any time from May, 1946 to the date of the hearing in 1957 was able to do any light work; all who examined him were essentially of the opinion that he was

totally disabled from doing any work, and most of them were of the opinion that his disability was permanent; two doctors expressed a mere hope, not shown to have been realized, that treatment might rehabilitate him to the extent that he might be able to do light work.

It is to be observed that plaintiff was in Allegheny General Hospital under the service of Dr. Steele who reported plaintiff totally and permanently disabled. No doctor from the hospital was called to deny his conclusion. Likewise, no doctor was called from the St. John's Hospital where plaintiff was a patient in 1956 to refute the medical evidence or express an opinion that plaintiff was able to engage in any substantial gainful activity. The hospital records were not procured.

The Falk Clinic report was made by the Librarian. Plaintiff was studied at the Clinic from January to March, 1955. No doctor from the clinic was called to contradict the medical evidence in the record or to express contrary opinions. On the other hand, Dr. Tannehill and Dr. Sarandria who treated plaintiff during this same period were emphatically of the opinion that his total disability continued to exist.

In our opinion this secondhand hearsay evidence submitted by the Librarian of Falk Clinic is too remote and not at all probative of the ultimate facts in issue and hence is not substantial evidence to support the conclusions and decision of the Council.

■ Mere uncorroborated hearsay or rumor does not constitute substantial evidence. Consolidated Edison Co. of New York v. National Labor Relations Board, 1938, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations

Board v. Amalgamated Meat Cutters, 9 Cir., 1953, 202 F.2d 671, 673.

The evidence on which the Council and Referee purported to rely is not only of "small probative value" but "in relation to the type of evidence reasonably anticipated in the circumstances of the case, that very slight proof must be characterized as unsubstantial." [3] At most it was "handpicked fragments of evidence" merely enough to raise a "suspicion".[4]

In our opinion there was no substantial evidence to contradict the medical opinions that plaintiff was totally and permanently disabled; neither was there any affirmative evidence that he had or could have, in view of his limited education and physical condition, engaged in any substantial gainful employment.

■ Expert opinions on such issues are admissible evidence to be considered by the fact finder, but when they are not repudiated in any respect by substantial evidence to the contrary, an adverse decision on these ultimate facts should be set aside as based on "suspicion" and "speculation".[5]

Where, as here, the evidence disclosed that plaintiff, though ambulatory since May, 1946, could not and did not engage in any substantial gainful activity, that his condition from the beginning, and at the time of hearing, could be expected to be of long-continued and indefinite duration, and there was no substantial evidence to the contrary, a finding against the plaintiff could hardly be sustained under § 1009(e) (B) (5), (6) of the Administrative Procedure Act, Title 5 U.S.C.A.

An appropriate order will be entered denying defendant's motion for summary judgment and reversing the decision of the Secretary.

---

3. Cream Wipt Food Products Co. v. Federal Security Adm'r, supra, 187 F.2d at page 791.

4. National Labor Relations Board v. Milwaukee Elec. Tool Corp., 7 Cir., 1956, 237 F.2d 75, 78.

5. National Labor Relations Board v. Columbian Co., 1939, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660; National Labor Relations Board v. International Brotherhood, 8 Cir., 1952, 196 F.2d 1, 4; National Labor Relations Board v. Amalgamated Meat Cutters, 9 Cir., 1953, 202 F. 2d 671, 673. Cf. Dickinson v. United States, 346 U.S. 389, 397, 74 S.Ct. 152, 98 L.Ed. 132.