**Eugene HILBER, Plaintiff,**

v.

**Abraham A. RIBICOFF, Secretary of Health, Education and Welfare, Defendant.**

**No. 715.**

United States District Court
D. Montana,
Butte Division.
May 18, 1961.

___

4. Application of Niewinski, D.C.Minn., 191 F.Supp. 272.

McCaffery, Roe, Kiely & Joyce and John Peterson, Butte, Mont., for plaintiff.

Krest Cyr, U. S. Atty., Butte, Mont., for defendant.

MURRAY, Chief Judge.

Plaintiff brought this action under the provisions of 42 U.S.C.A. § 405(g) to review a final decision of the Secretary of Health, Education and Welfare, in which it was decided that the plaintiff was not entitled to have a period of disability established under 42 U.S.C.A. § 416(i). In this connection in his complaint, plaintiff seeks also disability insurance benefits under 42 U.S.C.A. § 423 (a). However, the record shows that plaintiff has never applied to the Social Security Administration for disability insurance benefits. His only application was for a period of disability or "wage freeze" under § 416(i). Plaintiff has taken all the required administrative steps and the case is before the court for review of the decision of the Appeals Council of the Social Security Administration denying plaintiff's claim for a period of disability.

Under 42 U.S.C.A. § 416(i) (1), in order to be eligible for a period of disability, the plaintiff must establish that he is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or to be of long continued and indefinite duration, and that such disability had its onset at a time when plaintiff met the "quarters of coverage" requirement of the Act, set forth in 42 U.S.C.A. § 416(i) (3). Plaintiff last met the "quarters of coverage" requirement of the Act, as it existed at the time he filed his claim, on December 31, 1953, and, therefore, he must have become disabled as defined by the Act on or before that date.

The burden rested on the plaintiff to prove that he met the conditions of eligibility fixed by the Act for the establishment of the period of disability, Norment v. Hobby, D.C., 124 F. Supp. 489; Thurston v. Hobby, D.C., 133 F.Supp. 205; Dowell v. Folsom, D.C., 157 F.Supp. 46; Corn v. Flemming, D.C., 184 F.Supp. 490, and, as provided by § 205 (g) of the Act, 42 U.S.C.A. § 405(g), the decision of the Secretary, if supported by substantial evidence, is conclusive.

With these principles in mind the Court has reviewed the record that was before the Appeals Council and has come to the conclusion that the plaintiff has met his burden of proof, that there is no substantial evidence [1] in support of the Appeals Council decision, and that that decision must be reversed.

The record shows plaintiff was born May 4, 1906, and has a high school education with no special schooling of any kind. During summers before he finished high school he worked on road construction and drove a dump wagon. Following graduation from high school, he engaged in road construction and logging camp work. He testified that in 1930 or 1931 in connection with work in a logging camp he did some bookkeeping, although he was not a bookkeeper. Apparently the bookkeeping consisted of counting logs. In 1927 or 1928 he served in the army for a year and a half and achieved the rank of First Sergeant. He served again in the army during

---

1. In Aaron v. Flemming, D.C., 168 F.Supp. 291, 294, it is said: " 'Substantial evidence' has been best defined by Chief Justice Hughes as follows: 'Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' Consolidated Edison Co. of New York v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126."

World War II for three and a half years. During this service in World War II plaintiff claims he suffered a loss of hearing and an injury to his back. After his discharge from the service he applied to the Veterans' Administration for a disability rating on account of the hearing loss and back injury, and was granted a 10% disability rating for the loss of hearing, but was unable to establish a back disability.

Following his discharge from the army in 1945, plaintiff engaged in logging, foundry work and farm and ranch labor. He would work at a job for awhile and then have to quit and lay off work several months because of difficulty with his back. During this period he consulted an osteopath on several occasions for his back condition and in 1950 sought admission to a Veterans' Hospital for the back condition, but was refused admission and told to take aspirin. He also consulted another doctor who gave him some pills which did not help.

In May, 1953, while he was employed feeding cattle for a rancher or stock-grower in the vicinity of Dillon, Montana, he was injured in an automobile accident. This accident occurred while he was in the course of his employment and he was covered by the Workmen's Compensation Act, R.C.M.1947, § 92–101 et seq. He has not worked since the date of that accident, and claims that he is unable to. On his application to establish a period of disability, which he filed on February 9, 1956, he stated as follows:

"10(a) What is the nature of your injury or illness? Concussion syndrome, post traumatic atrophy & paresis right sterno-cleido & platssma muscles. Osteo arthritis, possible spine injury.

"(b) How does it prevent you from working at the present time? Am in bed most of time with dizzy headaches."

At the hearing before the referee, plaintiff testified that his neck and head hurt and that when he was up any length of time he suffered from dizzy spells and headaches which forced him to lie down. He further testified that he lives by himself in a small one-room cabin at Dillon, Montana; that he takes care of himself, tends his fire, cooks some of his own meals and walks 4 or 5 blocks to a store to shop, and on occasion sits in town talking with the fellows. During the summer prior to the hearing he had tended a small garden 10 by 15 steps in size; that he could work in the garden about an hour at a time and would have to quit and lie down. At the time of the hearing he had a neck brace which he was unable to wear too long at a time.

The medical evidence in the record commenced with plaintiff's admission to the hospital following the automobile accident on May 18, 1953. Apparently the attending physician at that time, Dr. J. C. Shields of Butte, Montana, was concerned only with the superficial aspects of the injuries because on the Department of Health, Education and Welfare medical report form he reports simply "car accident—5/18/53. Injured and 1st seen 5/18/53, adm. 5/18/53, dis. 6/9/53. adm. 7/12/53—Fractured nose. dis. from hospital 8/19/53. Nose operated 7/13/53. Diagnosis: Contusion of head, neck and chest. adm. to hospital 5/18/53. dis. 6/9/53." As far as Dr. Shields' report indicates, no x-rays or other laboratory or diagnostic tests were made—at least none are reported—and the doctor did not answer the question on the form as to whether he had advised plaintiff not to work.

However, in connection with his claim for workmen's compensation benefits as a result of injuries received in the accident, plaintiff was examined by Dr. H. M. Clemmons, an orthopedic surgeon, and Dr. M. A. Gold, a general practitioner, at Butte, Montana, in September, 1953. Dr. Clemmons reported preexisting hypertrophic arthritis of the cervical, thoracic and lumbo-sacral spine, aggravated by the injuries received in the automobile accident, with the motions of the spine markedly limited and associated with spasm of the erector spinae

muscles. Because of a suspected cerebral concussion he was referred to Dr. Gold. Dr. Clemmons rated plaintiff as 20% permanently partially disabled as a result of the orthopedic injuries received in the accident and referred him to Dr. Gold for an opinion as to the degree of permanent partial disability resulting from the cerebral concussion, if any.

Dr. Gold, in his examination, found residuals of a cerebral concussion, hypertrophic arthritis of the cervical, thoracic and lumbo-sacral spine, and a nasal deformity and indicated in his opinion plaintiff was 10% permanently partially disabled as a result of the residuals of the cerebral concussion received in the accident. Neither Dr. Clemmons nor Dr. Gold expressed an opinion as to the plaintiff's ability to work at the time they examined him.

On December 14, 1953, plaintiff settled his claim for workmen's compensation with the Industrial Accident Board of the State of Montana, on the basis of 52% permanent partial disability.

From August 20, 1953, through December 11, 1953, plaintiff was under treatment by a chiropractor, Dr. J. W. Hiltbrand of Dillon, Montana. Dr. Hiltbrand reported on plaintiff's condition as follows: "Cervical spinal scoliosis— spasticity and possible arthritis or fixation from injury (fracture). X-ray of cervical spine showed some fixations and distortion." He treated plaintiff by spinal adjustment and physiotherapy and noted moderate improvement. He stated that at the time of treatment plaintiff was unable to work.

Plaintiff was next treated by an osteopath, Dr. W. F. Anderson at Butte, Montana, from January 5, 1954, to November 7, 1955. Dr. Anderson reported plaintiff complained of dizziness when ambulatory and pain in the head and neck. He further reported that x-ray showed injury to axis and atlas vertebrae and that patient could be up only for a short time. He treated plaintiff by osteopathic manipulation with little response. He stated plaintiff's condition was chronic and that he had advised plaintiff not to work.

On June 18, 1954, plaintiff was admitted to the Veterans' Administration hospital at Fort Harrison, Montana, complaining of dizzy spells, headaches in the parietal area, occasional aching in the postero-neck, a costochondral sublaxation of the left 10th rib and a right weak knee. The report of this hospitalization was prepared by Dr. Joe C. Keever, M.D. Dr. Keever reported in connection with his physical examination "There is some atrophy of the muscles on the right side of the neck, the sternocleidomastoid muscle being completely invisible. The right shoulder is carried about 1″ low. The right trapezius muscle functions well. The right posterior cervical muscle group appears somewhat hypertrophied. The spinus process of C–6 is unusually prominent. There is about 20 degrees limitation of forward flexion of the cervical spine. There is a small perforation of the right ear drum, but no discharge or inflammation. Hearing is moderately diminished bilaterally. * * *." Dr. Keever's report concludes: "Hospital course: The patient entered the hospital 6–18–54 and after the routine workup it was felt that there was no evidence of orthopedic disease other than degenerative arthritis. The patient was seen by a General Medical Consultant in regard to the dizzy spells. It was his impression that these are suggestive of cerebral anemia and he had no treatment to recommend. An ECG is normal. It is felt that since this patient has no demonstrable orthopedic disease and there appears to be no explanation for the dizzy spells, he is recommended for discharge. Diagnois: 1. Degenerative arthritis, cervical spine, moderate. Untr. Unch. 2. Atrophy right sternocleidomastoid, etiology undetermined. Untr. Unch."

In considering this report of Dr. Keever, the Appeals Council stated: "As late as June, 1954, after the expiration of the claimant's insured status, the Veterans Administration found merely moderate degenerative arthritis of the spine, with atrophy of the right sternocleidomastoid

muscles and *with no resulting significant impairment of bodily function.*" The report does not contain the language italicized, and Dr. Keever expressed no opinion as to the effect of the conditions which he found upon plaintiff's bodily functions or his ability to work or engage in any substantial gainful activity. The report is equivocal to say the least. In one sentence it states "there appears to be no explanation for the dizzy spells", yet in a previous sentence it states that a General Medical Consultant feels that the dizzy spells are suggestive of cerebral anemia. At one point it states "there was no evidence of orthopedic disease *other than degenerative arthritis*", but at another point it states "since the patient has no demonstrable orthopedic disease". At any rate, the statement in the Appeals Council decision "with no resulting significant impairment of bodily function" is not the statement of the examining physician as the decision seems to imply, but is rather a conclusion of the Appeals Council which is not warranted by the report on which it is based.

Plaintiff was next examined by R. H. Southcombe, M.D., Spokane, Washington, on October 20, 1954, complaining of dizziness, headaches and tingling of the arms and fingers which he stated commenced May 18, 1953, the date of the accident. The objective findings reported by the doctor were "paresis rt. upper 7th nerve distribution. Osteoarthritis mid & lower cerv. vertebrae. Hypertrophic changes lateral articulation". The doctor's diagnosis was "Post concussion syndrome, Post traumatic paresis upper right 7th, Post traumatic paresis right sterno cleido mastoid muscle, Osteo arthritis". Dr. Southcombe recommended physiotherapy, but only saw the plaintiff on the one occasion and did not know whether the condition was static or what, if any, improvement could be expected. He did not answer the question as to whether he had advised plaintiff not to work.

On August 10, 1955, plaintiff underwent a physical examination at the Veterans' Administration Center, Fort Harrison, Montana, for the purpose of establishing disability and claiming compensation. The Veterans' Administration report of the medical examination for disability evaluation is in the record. In that report, under "Section A—Occupational History Since Latest Discharge from Military Service or Latest VA Examination" it is stated "He used to do ranch and farm work in the vicinity of Dillon. He has not been able to work any since May 18, 1953, at which time he received the injuries which resulted in his present disabilities." The diagnosis in the physical examination section of the report is "1. Deafness, nerve type, bilateral. 2. General arterio sclerosis. 3. Osteoarthritis of the cervical and dorsal spine". In connection with the same examination, there was a neuropsychiatric examination in which it was stated: "*Diagnosis:* 1. Residuals of concussion. 2. Psychoneurotic reaction, neurasthenia and hypochondriasis. 3. Traumatic paresis right facial nerve. 4. Atrophy and weakness right trapezius and sterno cleido mastoid muscles residuals right 11th cranial nerve injury. *Stress:* Associated with injuries incurred (May 18, 1953). *Predisposition:* None apparent. *Incapacity:* Severe." As a result of this examination, plaintiff states he was awarded a pension of $66.15 for non-service-connected total permanent disability and that it was dated back to sometime at the end of 1953.

In this connection, at the hearing, the referee suggested to the plaintiff in a question that a pension in the amount of $66.15 was for 20% disability, but the plaintiff insisted that it was for total permanent disability non-service-connected. The referee stated he would get the record from the Veterans' Administration, but apparently he did not do so as it does not appear in the record before the court. However, § 521, Title 38 U.S. C.A., provides for a pension for veterans of World War I, World War II and the Korean conflict who meet the service requirements and who are permanently and totally disabled from non-service-connected disability in the amount of $66.15, so

it seems obvious to the court in view of the plaintiff's testimony and in view of the statutory provision relating to veterans' pensions that the plaintiff was awarded the $66.15 pension on the basis of total permanent non-service-connected disability, rather than on the basis of the 20% disability suggested by the referee in his question.

The next medical report in the record in point of time is a report by J. Clare Hayward, M.D. of Logan, Utah, who stated he had treated plaintiff from 10-25-55, and that plaintiff was still under treatment on February 15, 1956, the date of his report. The plaintiff's complaints to Dr. Hayward were "Genl weakness. Pain in top of head. Weakness of neck and rt. upper extrem. Numbness of rt. upper extrem. Lower backache, etc." The objective findings reported by Dr. Hayward were "X-ray evidence of neck injury. Weakness and atrophy rt. upper extrem. Narrow lumbar 4 & 5 discs". The report also shows "arthritis and wedging of bodies several cervical vertebrae. Narrowing L. 4 and L. 5 disc spaces. Atrophy of rt. trapezius and sternocleidomastoid muscles & all muscles of rt. upper extremity". Dr. Hayward prescribed traction, a neck brace and sedation. He was unable to determine whether the condition was static, and in answer to the question as to whether he had advised claimant not to work, he answered: "No. However, he could do only very light work for short periods of time."

The last medical report in the record is by Dr. R. H. McLaren, a medical doctor of Dillon, Montana, who last examined the plaintiff in 1959. At that time the doctor reported complaints of "Painful neck & dizzy headaches". Under objective findings the doctor reported "X-rays reveal severe post traumatic arthritic changes c 4–5 & 6". The diagnosis "Post traumatic arthritis & scarring cervical region". The treatment reported was "Corticoid—neck supports & analgesics—equivocal results". Dr. McLaren reported the condition as static and that plaintiff could not work because of

headaches. Under "Remarks" the doctor stated "This man's persistent headaches & deviation of the neck, due to post traumatic change precluded gainful employment permanently, we believe".

Much of the medical evidence in the record deals with examinations and treatment of plaintiff after December 31, 1953, the date on which he last met the "quarters of coverage" requirement of the Act, but such evidence is relevant to show the long continued and indefinite duration of the impairment from which plaintiff suffers. The real significance of the long medical history, however, and the reason the court has felt it necessary to outline it at length, is the substantial consistency of both plaintiff's complaints and the findings and diagnoses of doctors from the time of the automobile accident in May, 1953, to and including the last medical report of Dr. McLaren in 1959. During all of this time, plaintiff's complaints were of headaches, dizzy spells and difficulty with his neck. From the reports of Doctors Clemmons and Gold, it is clear that plaintiff suffered a concussion and an injury to the cervical spine in the automobile accident and almost all of the doctors who subsequently examined plaintiff attribute his complaints to the concussion, and to injury and arthritis of the cervical spine. The two doctors who treated plaintiff closest in time to December 31, 1953, were Dr. Hiltbrand, who treated plaintiff from August 30, 1953, to December 11, 1953, and Dr. Anderson, who commenced treating plaintiff on January 5, 1954, and continued to treat him until November 7, 1955. Dr. Hiltbrand found x-ray evidence of cervical spine fixations and distortion, and Dr. Anderson found injury to the axis and atlas vertebrae. Both of these doctors stated that in their opinion plaintiff was unable to work during the time he was under treatment by them. Dr. Hayward, who treated plaintiff from October 25, 1955, to February 7, 1956, stated that plaintiff was able to do only light work for short periods of time, and Dr. McLaren in 1959 stated that he believed plaintiff was precluded permanently from

gainful employment. Both of these latter doctors attributed plaintiff's disability to headaches, dizziness and weakness and a deviation of the neck due to trauma and arthritis of the cervical spine. Thus over the period of years from 1953 to 1959, four different doctors expressed the opinion that plaintiff was unable to work. No doctor who examined plaintiff during this time expressed a contrary opinion and a contrary finding cannot be fairly made by a layman from any one or all of the doctors' reports. As stated in Hill v. Fleming, D.C., 169 F.Supp. 240, 245:

> "Expert opinions on such issues are admissible evidence to be considered by the fact-finder, but when they are not repudiated in any respect by substantial evidence to the contrary an adverse decision on these ultimate facts should be set aside as based on 'suspicion' and 'speculation.' (Citing cases.)"

The Appeals Council stated in its decision "It is undoubtedly true that claimant cannot today (decision dated September 9, 1960) engage in heavy or arduous work". The medical history, shown by the record, indicates also that there had been no substantial deterioration in plaintiff's condition from 1953 to the date of the Appeals Council decision, which would account for his inability to do heavy or arduous labor in 1960, whereas according to the Appeals Council's decision, he was able to do such work at the end of 1953.

Likewise significant is the award by the Veterans' Administration to the plaintiff of a total permanent non-service-connected disability rating dating back to 1953. In Carpenter v. Flemming, D.C., 178 F.Supp. 791, 793, cited by the Appeals Council, it was pointed out that a determination as to disability by a Workmen's Compensation Commissioner was not binding on the Secretary, and was of doubtful value as a persuasive factor inasmuch as the coverage, tests and purposes of the workmen's compensation legislation differed markedly from the disability provisions of the Social Security Act. However, with regard to the finding of total permanent disability of the plaintiff by the Veterans' Administration in this case, while that determination is not binding on the Secretary, it should be highly persuasive because the definition of permanent total disability with regard to the veteran's pension is substantially the same as contained in the Social Security Act. Thus § 502 of Title 38, U.S.C.A. provides:

> "(a) For the purposes of this chapter, a person shall be considered to be permanently and totally disabled if he is suffering from—
>
> "(1) any disability which is sufficient to render it impossible for the average person to follow a substantially gainful occupation, but only if it is reasonably certain that such disability will continue throughout the life of the disabled person;"

Finally, there is a suggestion that the decision of the Appeals Council may be based on the proposition that while plaintiff can no longer do the type of work he had previously done, he might be able to do other work. The decision states:

> "It is undoubtedly true that claimant cannot today engage in heavy or arduous work. However, he is a literate man and his education includes four years of high school. As of the date of discharge from his World War II service, October 30, 1945, (it was during this period when he evidently started to have back symptoms), he was 39 years of age, and when he stopped working in May 1953 he was only 47 years of age. With his ability to do the things for himself that he testifies he can do, the Appeals Council can find no reason for the claimant's inability to perform *any* type of substantial gainful activity. The mere fact that the claimant chooses to reside in a cabin in a rural area where there is small potential for employment cannot be the basis for

the establishment of a period of disability."

There is no evidence in the record of plaintiff's ability to engage in any occupation other than those involving manual labor. While he stated at one point in 1930 or 1931 that he did some bookkeeping, although he wasn't a bookkeeper, it appears that such bookkeeping involved the counting of logs in a lumber camp. Other than that, his work experience so far as shown by the record consists of labor in road construction, a foundry and on farms and ranches. As stated in Jacobson v. Folsom, D.C., 158 F.Supp. 281, 286, "implicit in this criterion (of ability to engage in substantial gainful activity) is that the gainful work be commensurate with plaintiff's educational attainments, his training and experience". From the entire record in this case, it is clear that plaintiff's educational attainments, his training and his experience qualify him only for earning his livelihood by manual labor.

As to his ability to do things for himself referred to by the Appeals Council, his testimony indicates that in taking care of himself he is unable to be up and active for more than an hour or two at a time without being forced to lie down. In Dunn v. Folsom, D.C., 166 F.Supp. 44 at page 49, it is pointed out that the word "substantial" as used in the Act does not modify "gainful", but rather modifies "activity". The activity in which the plaintiff must be able to engage must not only be "gainful", but it must be "substantial". The type of intermittent activity of which plaintiff is capable in relation to employment cannot be said to be substantial.

For the reasons set forth above, the Court is of the opinion that there is no substantial evidence in support of the decision of the Secretary.

Therefore, it is ordered and this does order that defendant's motion for summary judgment be denied and the case be remanded to the Secretary with directions that the plaintiff be granted a period of disability from the date of his injuries on May 18, 1953.