Paul WEBB, Plaintiff,

v.

Anthony J. CELEBREZZE, Secretary of
Health, Education and Welfare,
Defendant.

No. 1010.

United States District Court
D. Montana,
Butte Division.

Feb. 19, 1964.

Moody Brickett, U. S. Atty., and
Robert T. O'Leary, Asst. U. S. Atty.,
Butte, Mont., for defendant.

Joseph P. Monaghan, Butte, Mont., for
plaintiff.

MURRAY, Chief Judge.

This action is brought under the pro-
visions of Title 42, U.S.C.A., § 405(g) to
review a final decision of the Secretary
of Health, Education and Welfare deny-
ing plaintiff's application for a period of
disability and disability insurance bene-
fits under the Social Security Act, par-
ticularly §§ 416(i) and 423(a) of Title
42, U.S.C.A. The final decision of the
Secretary is embodied in the decision of
a Hearing Examiner, and the sole issue
in this case is whether there is any sub-
stantial evidence in the record before the
court supporting the Hearing Examin-

er's decision that plaintiff was not disabled within the meaning of the Act on or prior to July 1, 1961, the date by which plaintiff must have become disabled in order to be entitled to the benefits he seeks under his present application.

Under the Social Security Act "disability" is defined as inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long continued and indefinite duration. 42 U.S.C.A. §§ 416(i) (1) and 423(c) (2). These sections of the statute also impose upon the plaintiff the burden of proving his disability. The function of weighing the evidence and determining whether or not disability has been established is assigned to the Secretary, and the court's function in this proceeding is not to weigh the evidence, but simply to review the Secretary's decision and determine whether it is supported by substantial evidence. If the Secretary's decision is supported by substantial evidence, it is conclusive and must be affirmed. 42 U.S.C.A. § 405(g).

■■ "Substantial evidence" is more than a mere scintilla. It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Consolidated Edison Co. of New York v. National Labor Relations Board, 305 U. S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126; N. L. R. B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 59 S. Ct. 501, 83 L.Ed. 660. The question of what amounts to substantial evidence is a matter of law for the reviewing court to determine upon a considered evaluation of the whole record. Hayes v. Celebrezze, 311 F.2d 648, 651 (C.A. 5, 1963).

With these basic general definitions and principles in mind, the court has reviewed the record in this case in the light of the authorities hereinafter referred to and has concluded that there is no substantial evidence in support of the Secretary's decision; that the plaintiff has met his burden of establishing disability within the meaning of the act; and that the Secretary's decision must be reversed.

Plaintiff's application states that he became unable to work on July 25, 1960, due to a heart condition described as "scar on tube leading from heart which prevents blood leaving properly". The record shows that at the time of filing his application on April 17, 1961, plaintiff was approximately 58 years old, having been born on May 1, 1903. He completed two years of high school and attended a business college for five months in 1921, and a barber college in 1924.

Prior to 1942, plaintiff's only occupation had been selling and servicing dairy machinery and equipment. In 1942, because of the war, such machinery became unobtainable, and due to changes in the dairy industry practices, plaintiff's employment came to an end, and he came to Butte, Montana, where he obtained work in the mines as a motorman, repairman and miner. This work consisted of rather strenuous physical labor. He continued his work in the mines until April, 1954, when he was injured in an industrial accident. The injury occurred while plaintiff was riding in a metal mine ore car which jumped the track and struck a wall causing plaintiff's chest to strike the front of the car with sufficient force to render him unconscious. As a result of this accident plaintiff was hospitalized for four days.

After his release from the hospital, plaintiff returned to his job in the mines and worked for a couple of weeks, but was forced to quit because of shortness of breath, pain and numbness in his back and arms, and spells wherein he was unable to move his arms, because, as plaintiff put it, "I wasn't getting enough blood to—coming from my heart to supply the necessary energy to my system".

As a result of the accident plaintiff received an initial settlement of $900 under the Workmen's Compensation Act. Plaintiff was unable to work during the year 1955. When he attempted to return to work in the mines thereafter his

former employer refused to hire him on the grounds he was physically disabled. Plaintiff's claim under the Workmen's Compensation Act was reopened and he was found to be totally and permanently disabled and awarded the maximum allowance under the Montana Workmen's Compensation Law, by an order of the District Court dated July 25, 1956.

On September 26, 1956, plaintiff filed an application with the Social Security Administration to establish a period of disability commencing July 1, 1954, which was about the date he was forced to quit work after returning to his job after the accident. In that application he described his illness or injury as "injury to main artery of heart, weakness due to heart damage". When this application was turned down by the District Office plaintiff did not apply for reconsideration or for a hearing because he believed from what he was told "I would have to be practically blind and bedridden before I would be eligible".

In 1956 and 1957, plaintiff obtained employment as an automobile salesman. After working for several months in each year, he was laid off because he was unable to perform as expected, due to his physical condition. In the summer season of 1958, plaintiff managed a drive-in theater and was able to hold the job which consisted simply of opening up and counting the receipts. The following summer, 1959, he again was employed as manager of the drive-in theater, but was discharged in July, at the height of the season, because at that time the additional duty of picking up and transporting to the theater the cannisters containing the films was added to the manager's chores, and plaintiff was physically unable to perform this task.

In 1960 he again attempted to sell automobiles, but after a few months he was laid off because he was unable to put in the hours and perform the work expected of him in the job. In 1961, at the time of his hearing before the hearing examiner, plaintiff was employed temporarily by the State of Montana as an attendant in a tourist booth on a main highway. His duties consisted of sitting in the tourist booth and giving to tourists directions and information as to points of interest and highway conditions along the way. Plaintiff was employed in this position in the absence, due to illness, of the regular attendant, and was able to perform the duties. However, even if he got the job as his own, it is only a temporary position as the tourist booths are operated only three or four months during the year in the summer time. The pay for such job was $250 a month.

The condition which resulted in plaintiff being unable to perform the duties of car salesman and theater manager was that upon exertion, prolonged standing or excitement he would get "spells" of extreme shortness of breath and paralysis and pain in his arms and chest, which were relieved only by taking nitroglycerine pills and sitting down for a period of time. Overeating also brought on these spells, and plaintiff had to be up several hours in the morning before he could eat breakfast without suffering a spell. Because of this he was unable to get to his job as automobile salesman sometimes until the afternoon and this was one of the reasons for his discharge. In 1956 plaintiff consulted Mayo Clinic concerning this condition. No report from Mayo Clinic is in the record but plaintiff states he was told that an operation with a 50–50 chance of success was all they could do for him, and in view of his age, they recommended against such operation.

The medical evidence in the record is rather sparse, but it does tend to confirm the evidence given by the plaintiff. No doctor testified at the hearing, all of the medical evidence being in the form of written reports. The first such report was by Dr. H. W. Gregg, an internist, of an examination of plaintiff in February, 1956. At that time plaintiff's complaints to the doctor were "fainting and dizzy spells, pain in chest going into arms and shoulders. Indigestion." The doctor found objectively a "mild presystolic heart murmur heard at apex", and the

doctor concluded that plaintiff "has attacks that may be of angina pectoris from history. EKG within normal limits." Dr. Gregg at that time did not state whether he advised plaintiff not to work.

The next report is by Dr. V. O. Ungherini, physician and surgeon, who attended plaintiff at the time of his injury in 1954 and last saw him in October, 1956. Dr. Ungherini reported the subjective symptoms as "dyspnea on exertion, pain, substernal, upon exertion." As to objective findings Dr. Ungherini reported, "EKG shows myocardial damage, mitral stenosis and murmur, systolic in time". Dr. Ungherini advised the plaintiff not to work.

Dr. Gregg again examined plaintiff on June 30, July 25 and 26, 1961, these examinations being made on behalf of the defendant. The portions of the report relative to plaintiff's heart condition are as follows, with reference to the June 30th examination:

"The heart rate was 84, the rhythm regular, he had a long, soft systolic murmur at the apex, not transmitted to the axilla. The murmur was heard in the 3rd, 4th and 5th interspaces just to the left of the mid-sternal line. A2 was greater than P2. The blood pressure on that date was 170/100 in the left arm and 110/90 in the right arm. The radial pulse was equal on the two sides. There was no difference in color in the hands nor in the legs. * * *

"The electrocardiographic tracing shows a PR interval of .30 and a rate of 68. The tracing is otherwise within normal limits. This PR interval obviously means a rather marked degree of auriculo-ventricular block.

"There appears to be no pulmonary component in the man's dyspnea so we did not do pulmonary function studies."

On July 25, 1961, Dr. Gregg had the plaintiff return for a check on the blood pressure. He reported as of that date:

"The blood pressure readings on the right arm were 84/64 and 96/76. In the left arm the pressure was 150/90. The radial pulse was absent on the right, strong on the left. He said on this date that the right arm becomes numb at times. The heart rate on this day was 76 and he now had the mild presystolic murmur at the mitral area which was transmitted to the axilla at this time. A2 was greater than P2. Test for sensory function, touch, pain and temperature over the right hand was indefinite. I could get no consistent impression."

The doctor had the plaintiff return the following day, July 26, 1961, and as of that date reported:

"The blood pressure on the right was 106/100 and on the left 180/100. The radial pulse was still absent on the right."

As a result of these examinations Dr. Gregg concluded:

"I do not believe that this man's total picture can be appraised without further study, perhaps with arteriograms, etc. The presence of a presystolic murmur, which probably means mitral stenosis, along with the persistent but changing difference in blood pressure in the two arms, presents a tough problem in diagnosis and prognosis. We watched this man during the examination and to see him walking on the street one would not think he was near disabled as he says he is. However, that is just an impression and I believe that his final diagnosis and prognosis must be made after further work up, for which we do not have the facilities in Butte."

Apparently, as a result of this rather inconclusive report from Dr. Gregg, the plaintiff was referred by defendant to

the Great Falls Clinic wherein he was examined by Dr. Gilson of the Internal Medicine Department of that Clinic. According to his report, Dr. Gilson obtained the same subjective complaints as Dr. Gregg, and made the same objective findings, including the abnormal PR interval on the electrocardiogram, the difference in blood pressure between the arms, the definite systolic heart murmur, and the absence of pulse in the right arm. Dr. Gilson had the same difficulty in correlating the subjective and objective findings that Dr. Gregg experienced, but he did conclude:

"It would be my conclusion, therefore, that this man is disabled because of anginal symptoms for which we do not have objective confirmation. He has a history and previous objective findings which would admit the probability of angina developing as a consequence of these previous findings. The diagnosis is still presumptive in the absence of objective proof, but under the circumstances the diagnosis cannot be seriously questioned.[1] It would appear that walking for a short distance, or other minimal physical exertion is associated with incapacitating symptoms."

Thus, the medical evidence in this record to the effect that plaintiff is disabled is uncontradicted. Of the three doctors whose evidence was presented, two found plaintiff disabled. Dr. Ungherini advised plaintiff not to work, and Dr. Gilson, as a result of his examination concluded that "this man is disabled". The third doctor, Dr. Gregg, while finding substantially the same conditions as the other two doctors, expressed no opinion as to disability.

Opinion evidence of expert witnesses is advisory and not binding on the trier of the fact, the Hearing Examiner in this case. However, as stated in Hill v. Fleming, 169 F.Supp. 240, 245 (D.C. W.D.Pa.1958):

"Expert opinions on such issues are admissible evidence to be considered by the fact finder, but when they are not repudiated in any respect by substantial evidence to the contrary, an adverse decision on these ultimate facts should be set aside as based on 'suspicion' and 'speculation' (Citing cases)."

To the same effect see Teeter v. Fleming, 270 F.2d 871, 874, 77 A.L.R.2d 636 (C.A. 7), and Kohrs v. Flemming, 272 F.2d 731, 736 (C.A. 8).

In Hall v. Celebrezze, 314 F.2d 686, 689 (C.A. 6, 1963) the court, in connection with medical testimony, stated:

"Since the statute required that the disability result from a 'medically determinable physical or mental impairment.' (42 U.S.C. § 416(i) (1) and § 423(c) (2)), the claimant had no way of establishing his case if his credible medical evidence is disregarded. While the Secretary may have expertise in respect of some matters, we do not believe he supplants the medical expert."

The Hearing Examiner apparently accepted, to some extent at least, the medical evidence and the testimony of the plaintiff as to his disability for he stated in his opinion "Claimant does have a medical condition evidenced by a heart murmur and unequal blood pressure in the upper extremities; and, as shown, this causes him discomfort in the form of numbness, breathlessness on undue exertion and perhaps other symptoms.

---

1. In connection with this conclusion of Dr. Gilson it is to be noted that the statute does not require objective confirmation of the disability or its causes. "But the statute does not require that disability or its cause be 'substantiated objectively.' Of course it must be 'by reason of any medically determinable physical or mental impairment.' But modern medicine is neither so scientific nor so helpless today that it either does, or must, evaluate only objective factors." Hayes v. Celebrezze, 311 F.2d 648, 649 (C.A.5, 1963). See also Page v. Celebrezze, 31 F.2d 757 (C.A.5, 1963) ; Hebert v. Celebrezze, 222 F.Supp. 533 (D.C.Mont.1963).

The examiner has no desire to minimize this condition and the attendant discomfort." The Examiner based his decision that plaintiff was not disabled on the fact that at the time of the hearing plaintiff was employed in the tourist information booth. He states in his decision, "The record shows that at the time of the hearing claimant was engaged in sedentary, although seasonal employment. Actual employment is the best test of one's ability to so engage * * *. In view of the claimant's clearly demonstrated capacity to engage in sedentary employment the examiner has no choice but to conclude he has failed the requirements of the Act." In this conclusion the Examiner was in error.

In Flemming v. Booker, 283 F.2d 321 (C.A. 5, 1960) at 324, the court said with reference to a similar finding:

> "The Referee, found that, 'the regularity and continuity of claimant's services in the used car lot during this statutory period makes a finding of inability to engage in gainful work wholly untenable.' We do not agree. There is no reason why the rules established by the Supreme Court and by this Circuit in connection with other statutes should not be here applicable. In Berry v. United States, 1941, 312 U.S. 450, 455, 456, 61 S.Ct. 637, 639, 85 L.Ed. 945, Mr. Justice Black, speaking for a unanimous Court, said:
>
> > " 'It was not necessary that petitioner be bedridden, wholly helpless, or that he should abandon every possible effort to work in order for the jury to find that he was totally and permanently disabled. It cannot be doubted that if petitioner had refrained from trying to do any work at all, and the same evidence of physical impairment which appears in this record had been offered, a jury could have properly found him totally and permanently disabled. And the jury could have found that his efforts to work—all of which sooner or later resulted in failure—were made not because of his ability to work but because of his unwillingness to live a life of idleness, even though totally and permanently disabled within the meaning of his policies.'

> "In Mabry v. Travelers Ins. Co., 5 Cir., 1952, 193 F.2d 497, 498, Judge Holmes, for this Circuit, said:
>
> > " 'Pinched by poverty, beset by adversity, driven by necessity, one may work to keep the wolf away from the door though not physically able to work; and, under the law in this case, the fact that the woman worked to earn her living did not prevent a jury from finding, from the evidence before it, that she was totally and permanently disabled even while working.' "

The job which plaintiff was temporarily holding in the absence of the regular employee due to illness, that is, sitting in the tourist booth and giving information and directions, involved no activity, the performance of which would compel a finding of no disability under the Act. A paraplegic or one totally blind could perform the activities required of plaintiff in the booth. Moreover, even if plaintiff were to obtain the job permanently, which he had not as of the time of the hearing, his earnings would not come up to the Department's own internal administrative standard for judging "substantial gainful activity." Under that standard the Department regards earnings of $1200 a year or more as "substantial". Flemming v. Booker, supra; Butler v. Flemming, 288 F.2d 591 (C.A. 5, 1961). The tourist booths in which plaintiff was working are open only three or four months a year, and at the $250 monthly salary which the job paid, plaintiff's earnings would fall short of the $1200. There is no showing that the opportunity for such employment or similar employment exists in this area on year around basis, or any

more steady basis than the State Tourist Booths afford.

Speaking of the burden of proof in these Social Security disability cases in Butler v. Flemming, 288 F.2d 591, 595 (C.A. 5, 1961), the court said:

"If there was any work which this Claimant was able to perform, the record fails to disclose it. We do not mean by that to suggest that the formal burden is on the Government to make any such specific showing since the statute puts the general burden on the claimant. But in the context of this Act and the manner in which, out of necessity, it has to be administered with much informality, and in great volume, satisfaction of the claimant's statutory obligation is to be judged in a practical way. Kerner v. Flemming, 2 Cir., 1960, 283 F.2d 916, 921–922. Considering the background, experience, training, education, physical and mental capabilities of the Claimant, the kinds and types of employment formerly followed and no longer open to him, the absence of any indication of any specific work less exacting within his residual competency and reasonably available as a prospective source of employment in the general area where he lives, this record satisfies that test."

Here also the record satisfies that test. The occupation of theater manager and automobile salesman are about as sedentary as any occupation in this general area which is within the plaintiff's capabilities to perform, considering his background, experience, training, education and the kinds and types of employment he formerly followed. When the record establishes, as it does, that he is no longer physically able to perform those jobs, the burden of proof has been met, and plaintiff is entitled to the benefits which he has applied for.

Therefore, it is ordered and this does order that defendant's Motion for Summary Judgment be and the same hereby is denied.

It is further ordered that the final decision of the Secretary is reversed, and the cause is remanded to the Secretary with directions that plaintiff be granted a period of disability and disability insurance benefits from July 25, 1960.