Mrs. Ruth H. **WALKER**

v.

John W. **GARDNER**, Secretary of Health, Education and Welfare.

Civ. A. No. 6228.

United States District Court

E. D. Tennessee, N. D.

Feb. 28, 1969.

John D. Lockridge, Knoxville, Tenn., for plaintiff.

J. H. Reddy, U. S. Atty., Chattanooga, Tenn., W. Thomas Dillard, Asst. U. S. Atty., Knoxville, Tenn., for defendant.

## MEMORANDUM

ROBERT L. TAYLOR, Chief Judge.

This is an action pursuant to 42 U.S.C. § 405(g) to review the final decision of the Secretary of Health, Education and Welfare. In its final action on October 25, 1968, the Appeals Council reaffirmed its earlier decision in which it reversed the Hearing Examiner's finding that plaintiff was entitled to disability insurance benefits.

Born in 1922 and raised in East Tennessee, plaintiff began work in 1944 with Tennessee Eastman at Oak Ridge. She worked for Southern Bell Telephone Company as a switchboard operator from 1947 until 1951 when she took a personal leave of absence to travel with her husband who was required to move to various construction sites. During that leave she became severely ill with symptoms including coughing up blood (hemoptysis). Dr. William Rogers reported examining her at that time and finding a history of cyanosis since plaintiff was a child. He indicated that he was unable to determine the etiology of her difficulty but believed that there was definitely pulmonary hypertension due to some cardiac disease. Dr. Rogers reported that the patient's regular doctor, Daniel Davis, was to send plaintiff to Philadelphia for an examination by Dr. Robert Glover, a specialist.

In April, 1953 plaintiff was hospitalized for a pregnancy which ended in a spontaneous abortion. Thereafter, in July 1953, she was examined by Dr. Glover in Pennsylvania. His general conclusion was primary pulmonary hypertension or idiopathic pulmonary hypertension. Based on the patient's history, a physical examination, fluoroscopy, electrocardiogram, and cardiac catheterization, Dr. Glover made the following analysis:

"  *   *   *   The pulmonary and right ventricular hypertension in the presence of only a slightly elevated capillary pressure and in the absence of any enlargement of the left atrium speaks for severe pulmonary vascular changes to account for her rather marked symptoms of dyspnea and hemoptysis. The pulmonary vascular changes, no doubt, are due to organic disease in the arterioles such as intimal fibrosis and/or medial hypertrophy although the same picture has been described on a purely idiopathic pulmonary artery dilatation basis."

Doctor Glover's prognosis was the following:

"We have had occasion to explore several of these cases in the past and none have done very well and the mortality was very high. Although such a diagnosis leaves me with an empty feeling nevertheless it seems to be a correct one and, as you know, there is no surgical treatment. I fear that this patient's prognosis is very grave. Possibly, we should have explored her because of her youth and because of her poor future outlook in the hope that we might be wrong and if you feel this course of action should be taken in the future, I will certainly reconsider our present attitude."

During the period from 1953 to present, the plaintiff remained under the regular care of Dr. Dan Davis of Knoxville; but in 1966 he again referred her for thorough examination by a specialist in cardiovascular diseases, Dr. Don Chapman in Houston.

From his examination of plaintiff Dr. Chapman found in part: definite cyanosis of her lips; mild suffusion of her conjunctiva, with increased size of her retinal veins; blood pressure 110 over 60; marked overaccessibility of the right ventricle; accentuated second sound in pulmonary area; pulmonary diastolic decrescendo murmur; and mild clubbing of the nails. After the examination, X-ray, pulmonary function

studies, and cardiac catheterization, Dr. Chapman concluded that plaintiff had primary pulmonary hypertension with patent foramen ovale. He discussed the possibility of treatment as follows:

"Unfortunately, as you know, there is no type of surgical interference that is of any value in these patients. Pulmonary sympathectomies have been tried in the past and have been found to be of no value. At one time there was a drug called BX-45-50, from Burroughs-Wellcome, which was supposed to elevate systemic pressure and lower pulmonary arterial pressure, but proved to be a dud. So far nobody has had any successful surgical approach to this particular disease process. I am afraid that she will have a progressive downhill course, she will probably also have repetitive bouts of right sided cardiac failure."

The findings of the specialists were confirmed by Dr. Davis who regularly saw the patient throughout the period in question. The letter of Dr. Rogers written to the Tennessee Hospital Service in 1953 indicates that at that early date Drs. Davis, Waterman and Rogers agreed that she suffered from pulmonary hypertension but were unable to agree on the etiology.

Doctor Davis stated that he first saw plaintiff in 1953 when she was in Baptist Hospital at which time her record showed an onset of hemoptysis in 1947 with "a severe episode in 1950 requiring a rather long period of hospitalization at Oak Ridge." Dr. Davis reported that after leaving the hospital in 1953, plaintiff was followed closely by his office and that she continued to have episodes of hemoptysis. His letter of June 23, 1967 disclosed the following history of plaintiff's illness since the initial contact:

"* * * In June of 1953 I felt for the first time that I was able to hear a short presystolic murmur at the mitral area. Patient continued to have a snapping first sound at the apex and the pulmonic second sound continued to be greater than the aortic second sound. *Patient's course over the years has been slowly but progressively downhill and a few years after my initial examination* I heard for the first time pulmonary diastolic murmur." (Emphasis added.)

Doctor Davis related that the plaintiff has been on a low sodium diet, maintenance digitalis therapy, mild sedation, limited activities since she was first seen by him, and that in recent years she had been on oral diuretics. In all, four letters from Dr. Davis are in the record. In every one he reported that the symptoms of the disease had been progressively severe through the present. In two he unequivocally expressed his medical opinion that the patient had been unable to work since 1953 even though he indicated in Exhibit 24 that he knew she had worked for short periods.

The claimant was reported cyanotic in 1953, 1964, 1965, 1966 and 1967. The following is a list of the periods of hospitalization in the record: three times in 1953, mainly for hemoptysis; once in 1954 for a possible pregnancy; sixteen days in January 1959 with a diagnosis of idiopathic pulmonary hypertension; over a month for the same reason in November, 1964; and for examination in Houston.

Between 1959 and 1964 plaintiff held three different jobs at which she earned over $125.00 per month for at least nine months. The Appeals Council relied heavily on reports from these employers. The reports indicate an abortive attempt to return in 1954 to work for Southern Bell Telephone, her employer immediately before her illness. In 1959 she worked as an extra sales clerk at Sears-Roebuck during the Christmas shopping season. For three weeks she solicited donations for the Knoxville Cancer Society. In June, 1961, she began an eight month period of employment with Southern Bell. She worked an eight hour day, forty hour week, as a long distance operator. Her employ-

ment ended when the Oak Ridge office converted to a dial system. No sick leave was noted on the records for this period. Plaintiff worked as a sales clerk at Sears during the Christmas seasons in 1961 and 1962; and between May, 1963 and April of 1964 she worked as a part-time employee. The Sears record states that she resigned because she was unable to work.

With regard to the operator's job at Southern Bell, plaintiff testified that she had gotten it with the help of persons she had worked with in 1950. Plaintiff and her husband testified that she went back to work in 1959 without telling her doctor and against his directions. They stated that they were in debt and that she had decided that she was not going to lie in bed and wait to die, but was going to try to work. The work as an operator was said to be very light and that the hardest part of the job was getting her ready in the morning. Claimant testified that she had to be on her feet as a sales clerk at Sears but that her fellow workers would help her when she had to go and rest. The work record shows that the part-time work was usually three or four hours a day and that Sears called her only when she was needed.

By decision of August 30, 1967 Hearing Examiner Charles Caudle found that claimant was entitled to disability benefits because of a disability existing on the last date on which she retained her insured status, June 30, 1957. He stated his conclusions as follows:

"The case was originally allowed but was later disallowed for the reason that the claimant's earnings record showed that she had had substantial earnings in 1960, with lesser earnings in 1961, 1962 and 1963. The claimant, in her testimony, explained this by stating that her work performed was of an extremely light and sedentary nature, that was arranged for her by her friends after she decided she would rather try doing something than to surrender completely to her affliction; which to this examiner is commendable

and for which she should not be penalized.

"From all the medical evidence this examiner must conclude that the claimant suffers from primary pulmonary hypertension, a highly disabling disease, since April 3, 1953; that this affliction is and has been in the severe stage as witness her cyanosis; and that there is no medical cure for this situation."

The Appeals Council reversed the Examiner on the basis of the work record in 1959 through 1964. At request of the Secretary the Court remanded the claim for further action. On October 25, 1968, the Appeals Council again held that plaintiff was not entitled to disability insurance benefits. The Council stated, "The Appeals Council acknowledges that claimant's condition at the time (1953) was severe and there is no indication that her condition improved prior to the time she returned to work in November 1959." The Council found specifically that "claimant's impairment prevented her from engaging in substantial gainful activity commencing on March 20, 1953 and continuing up to and including November 10, 1959 at which time she improved sufficiently so as to be able to carry on substantial gainful activity."

The Secretary does not question that claimant was disabled between 1953 and 1959 and that she is presently disabled. The only holding that the Appeals Council made on present disability was that claimant could not base a claim for benefits on disability since 1957 because of the period of non-disability since then. The Hearing Examiner held that she was under present disability. The reports of Dr. Chapman of Houston and Dr. Davis establish that plaintiff's illness is at least as severe as it was in 1953 when the Secretary acknowledges disability.

The sole basis for the Secretary's finding of no disability between 1959 and 1964 is the fact that claimant worked. The Court has held in King v. Cele-

brezze, 240 F.Supp. 177 (D.C.1965), that the Appeals Council could find an ability to do substantial gainful activity from the work record of a claimant who was subject to epileptic seizures but who most of the time was able to work. Our Court of Appeals affirmed that decision, holding that the Secretary could permissibly find no disability after weighing the claimant's work record against his testimony that he lost his job every time his disease was discovered. King v. Gardner, 6 Cir., 370 F.2d 652, at 654.

■ The principle announced by this Court in the *King* case is not controlling of the present case. In the *King* decision the only evidence that claimant was unable to work was his own statement. All the medical evidence showed that the claimant's disease was "fairly well controlled." By contrast, in the instant case the uncontradicted medical evidence is that the plaintiff's heart condition was so severe in 1953 that she was unable to work and that her condition has grown progressively worse. In the face of uncontradicted, well qualified medical opinion that a claimant can only work at grave danger to her health and in face of uncontradicted testimony that the claimant decided to work in disregard of her doctor's instructions, the Secretary may not speculate that the claimant's condition improved sufficiently in 1959 to make her able to engage in substantial activity. Colwell v. Gardner, 386 F.2d 56 (C.A.6, 1967); Walston v. Gardner, 381 F.2d 580 (C.A.6, 1967).

■ Moreover, the Secretary cannot successfully rely on the provision of the 1967 amendments, 42 U.S.C. § 423(d) (4), which directs the Secretary to make regulations which set out the criteria for substantial gainful activity. Although the provision and regulation are applicable, P.L. 90–248, section 158(e), 81 Stat. 821, the regulation made thereunder, 20 CFR § 404.1534(b), provides that a person earning in excess of $125.00 a month shall be deemed able to engage in substantial gainful employment *"in the absence of evidence to the contrary."* All the evidence in this record indicates that claimant was unable to engage in substantial activity without gravely endangering her health.

■ In accord with the quoted portion of the regulation is judicial interpretation which establishes that the fact that a claimant has worked since the start of disability does not conclusively show ability to engage in substantial gainful activity, but must be considered in light of the record as a whole. Flemming v. Booker, 283 F.2d 321 (C.A.5, 1960); Leftwich v. Gardner, 377 F.2d 287 (C.A.4, 1967); Hanes v. Celebrezze, 337 F.2d 209 (C.A.4, 1964); cf. Berry v. United States, 312 U.S. 450, 61 S.Ct. 637, 85 L.Ed. 945.

■ The Appeals Council must be affirmed unless the findings are not supported by substantial evidence or the Secretary applied an erroneous legal standard. Davis v. Gardner, 395 F.2d 681 (C.A.6, 1968); Whitt v. Gardner, 389 F.2d 906 (C.A.6, 1968).

■ The Court holds that there is not substantial evidence on which to base the Secretary's finding that plaintiff's condition improved sufficiently in 1959 to enable her to engage in substantial gainful activity. Specialists in cardiac-pulmonary diseases found in 1953 and 1966 that claimant was suffering from a severe case of primary pulmonary hypertension. The Philadelphia specialist, Dr. Glover, stated in 1953 that there was no effective treatment for the disease and made the prognosis that plaintiff's future was grave. Dr. Davis stated that he regularly treated plaintiff after that prognosis and confirmed that plaintiff's condition had been "slowly but progressively downhill" until the present. The examination by the Houston specialist reaffirmed the diagnosis and prognosis which had been given by Drs. Glover and Davis. The Appeals Council's view that there was an improvement in condition in 1959 would have been more plausible since claimant had not been hospitalized since 1954 except for the fact that early in the year of her supposed improvement she was in the hospital sixteen days be-

cause of severe symptoms of idiopathic pulmonary hypertension. The Hearing Examiner found that the claimant was in fact disabled throughout the entire period.

The motion for summary judgment of claimant, Mrs. Ruth H. Walker, must be sustained.

Since there is no substantial evidence to support the findings and conclusions of the Appeals Council, the Secretary's motion for summary judgment must be, and same hereby is, denied.