James T. **WATTS**

v.

**Robert FINCH, Secretary of Health, Education and Welfare.**

**Civ. A. No. 6762.**

United States District Court, E. D. Tennessee, N. D.

March 17, 1970.

Charles B. Lewis, Morton, Lewis and King, Knoxville, Tenn., for plaintiff.

John L. Bowers, Jr., U. S. Atty., Knoxville, Tenn., for defendant.

## MEMORANDUM

ROBERT L. TAYLOR, District Judge.

James T. Watts seeks review of a decision of the Secretary of Health, Education and Welfare that he is not entitled to disability benefits as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423.

Watts, a resident of Rockwood, Tennessee, born June 25, 1915, completed six years of formal education. A child-

hood injury or disease has so restricted the use of his right arm that his work experience has been limited to light industry. After starting work at a textile mill in 1931, plaintiff became a textile machine repairman during the World War II manpower shortage. He continued working as a repairman for the same company or successor company until new machinery was installed. Repairs on this type equipment required both hands and plaintiff was not able to do the work. His employer retained him for some period of time at odd jobs, but finally he was terminated. Plaintiff moved from Rockwood to Chattanooga in 1961. There he was able to find work repairing the older type machines. He continued at this work until early 1962 when he stopped work because the lint in the mill aggravated a lung condition. From 1962 until 1967, the Secretary's records show plaintiff's total earnings as $249.11. Plaintiff testified that he was only able to do odd jobs since 1962; for instance he had looked after a pool room when the proprietor was out of town. In 1967, plaintiff's wife became ill and he "just had to grab at something if I could * * *." From March until September he earned $200.00 monthly working at a marina. His job consisted of answering the phone and readying boats stored there for outing. A skin inflammation on his feet and ankles hampered circulation and forced him to stop work.

On February 1, 1968, plaintiff made application for disability insurance benefits. He listed his disability as "one arm paralysed since childhood, emphysema, high blood pressure" and answered that he was unable to work because of these infirmities on September 30, 1967. The Secretary denied this initial application because plaintiff's coverage had ended on June 30, 1966. Plaintiff testified that Dr. Lindsay had told him to apply for disability benefits on March 11, 1964. He stated that he subsequently talked with a Social Security representative and decided not to make an application. He reasoned "and I figured maybe I would get to feeling better and work. I hate to think I have to give up the rest of my life."

On this basis plaintiff alleged a disability starting March 11, 1964, and asked the Secretary to reconsider his application. Upon reconsideration the Secretary concluded:

"* * * On the basis of the overall medical evidence in [the] file it appears that the applicant's condition would not be considered disabling at any time when the Q/C [Quarterly Coverage] requirement was met or at the present time for an allowance of the application."

At the hearing the Examiner expressed concern over the lack of medical evidence. At his request plaintiff and his son attempted to explain this shortage since 1960. Dr. Chester treated plaintiff in 1960 and 1961 until his death. Dr. Schacklett treated plaintiff for a short while until he moved from Rockwood. Dr. Lindsay then had been treating plaintiff for some time when he advised plaintiff to apply for disability benefits. Dr. Lindsay sold his practice to Dr. Chesney, the only doctor to submit reports on plaintiff's behalf. Dr. Chesney first treated plaintiff on January 16, 1968. However, he did submit a copy of a report by Dr. Lindsay dated March 11, 1964.

The Hearing Examiner (The Appeals Council denied review) held that the record before him did not establish a disability prior to the end of coverage June 30, 1966. While he felt that the evidence showed a severe impairment at the time of hearing, March 25, 1969, the facts that plaintiff was able to earn $200.00 monthly in 1967 after coverage expired; that plaintiff was able to drive "20 miles to work and back, on a daily basis during that period * * *;" and that plaintiff did not prove his impairments before coverage expired by "medically acceptable clinical and laboratory diagnostic techniques," 20 C.F.R. 404.1501(c), precluded a finding of disability.

The medical evidence shows plaintiff is suffering from emphysema, a withered arm, stasis dermatitis of the lower extremities and high blood pressure which is controlled by medication. The Secretary correctly determined that there was no evidence of high blood pressure or dermatitis before June 30, 1966, and that these ailments could not be considered in determining whether plaintiff was under a disability. Consequently, plaintiff's disability must result from his arm and emphysema.

■ Doctor Lindsay's records of March 11, 1964, as reported by Dr. Chesney, showed plaintiff apparently developed palsy of the right arm due to dislocation of the right shoulder during infancy. There was atrophy of the deltoid muscle which limited motion of the shoulder. Dr. Chesney found the right upper extremity small, weak, and for practical purposes useless. He found little strength in the arm and a weak grip. Dr. Stevens, an orthopedic surgeon, examined plaintiff on December 17, 1968, at the Secretary's expense. He reported:

"Objectively, this patient has atrophy of the shoulder girdle muscles and of the entire right upper extremity. This includes the upper and lower arm and the intrinsic muscles of the hand. There is not a complete paralysis, but certainly the patient has lost the ability to abduct the right shoulder. He has very slight flexion of the elbow and certainly very markedly weakened biceps function. There is very little if any triceps function. There is no rotary motion of the forearm. There is hand function, but certainly this is markedly weakened and markedly deformed.

"DIAGNOSIS: The possibility of a dislocated shoulder in this age child certainly would not cause this problem that he has. I feel that he probably had either poliomyelitis or a birth injury that could have caused his present disability.

"The disability to this right upper extremity is considerable, at least 70 per cent."

In view of these reports, there is no dispute that plaintiff suffered a disabled arm before coverage expired. However, even the loss of an arm below the elbow has been held not to be disabling. May v. Gardner, 362 F.2d 616 (C.A. 6, 1966). This impairment in itself will not support a finding of disability.

■ This conclusion leaves the question of whether plaintiff's pulmonary condition was disabling before June 30, 1966 within the meaning of the Act. Plaintiff testified that a severe cough caused him to initially quit work in 1962. He felt "a little better" after he stopped work. Medication did him little good. Before his coverage expired, he could not walk the four blocks from his home to town without resting. Walking up one flight of stairs caused such weakness and shortness of breath that he could not continue without rest. He did little to help his wife with the housework and did not mow his yard.

Doctor Lindsay's examination of March 11, 1964, showed plaintiff "also complains of frequent cough and chest pain—wants to get social security." He diagnosed bronchitis but did not state the severity of the condition.

Doctor Chesney commented on Dr. Lindsay's report in this manner:

"I am writing regarding Mr. James Watts. I first treated Mr. Watts on 1–16–68, and at [that] time, I would be able to definitely state that I considered him totally disabled at that time, and for some time prior to that.

"Now he was treated on 3–11–64 by my predecessor in this office, Dr. Jack Lindsay. His examination, at that time; (information taken from his chart) indicated to me that the same conditions existed at that time (3–11–64), as when I examined him (1–16–68). Thus it would appear to me that he was totally disabled on or before June, 1966."

In his initial medical report of February 20, 1968, Dr. Chesney stated:

" * * * [Watts] is also bothered by increasing dyspnea upon exertion, cough and easy fatiguability * * * [Patient's] shortness of breath and weakness has responded poorly to treatment."

Plaintiff was 5' 10", weight 137, with a respiratory rate of 24. Under respiratory the doctor found distant breath sounds, chest rather tight and a few scattered rhonchi. A chest X-ray showed a flattened diaphragm and hyperaerated lung fields. Chronic bronchitis and emphysema were diagnosed. In a subsequent letter the doctor stated that the emphysema was severe. He also gave his opinion that plaintiff was totally disabled when he first examined him on January 16, 1968, and that the disability existed before coverage expired, at least nineteen months before this examination.

Doctor Obenour, a specialist in pulmonary diseases, examined plaintiff on December 17, 1968, some 29 months after coverage expired. He stated:

"This 53 year old white male has had chronic cough for about five years. The cough is generally non-productive. He has had some episodes of dyspnea at night recently associated with upper respiratory infection. He has had exertional dyspnea for several years. He has had increase in dyspnea during the past few years * * *"

He found that "this patient's main impairment appears due to obstructive lung disease." He interpreted pulmonary function studies to show "very severe obstructive ventilatory insufficiency, not significantly changed by bronchodilator administration."

The Hearing Examiner found:

"4. That claimant now suffers from a pulmonary disorder of severe proportions, but that the record is devoid of credible medical evidence to the effect that such condition had reached a level of severity, either alone or in combination with his arm impairment, to prevent his engaging in substantial gainful activity prior to June 30, 1966."

The Hearing Examiner incorrectly applied the statutory mandate, 42 U.S.C. § 423(d)(3), and the Secretary's regulation, 20 C.F.R. 404.1501(c), which requires that impairments be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." In essence, he held that Dr. Chesney's conclusion that Watts was disabled when Chesney first examined him, nineteen months after coverage expired, and that this disability had existed during coverage was not credible evidence, especially under the statute. We disagree. All the evidence in this case showed Watts suffered from a pulmonary disorder. The question was the extent of the disorder. The consultative examination showed that the emphysema was disabling 29 months after coverage expired. The impression was of "*chronic* bronchopulmonary disease." (Emphasis supplied) This examination was in accord with the required diagnostic techniques. Plaintiff's physician diagnosed *chronic* bronchitis and emphysema some ten months earlier. There is no material variation between the two reports. Both show disability severe enough to justify an award of benefits. Plaintiff's symptoms were consistent with the reports. In view of all the evidence, the Court concludes that there was disability during coverage.

The only evidence that tends to refute an inability to perform substantial gainful activity is Watts' work from March until September, 1967, during his alleged period of disability. Pursuant to statutory authority, 42 U.S.C. § 423(d)(4), the Secretary has formulated regulations which "prescribe the criteria for determining when services performed or earnings derived from services demonstrate an individual's ability to engage in substantial gainful activity." Presently, monthly earnings in excess of $140.00 "shall be deemed to demonstrate his ability to engage in substantial gainful activity unless there is affirmative

evidence that such work activities themselves establish that the individual does not have the ability to engage in substantial gainful activity under the criteria in [20 C.F.R.] §§ 404.1532 and 404.-1533 and paragraph (a) of this section." 20 C.F.R. 404.1534(b). The cited regulations are entitled "Evaluation of Work Activities" and "Time Spent in Work," respectively:

This Court has construed the above regulation. (We do not deem the change in wording significant.) We said:

"* * * the fact that a claimant has worked since the start of disability does not conclusively show ability to engage in substantial gainful activity, but must be considered in light of the record as a whole. Flemming v. Booker, 283 F.2d 321 (C.A. 5, 1960); Leftwich v. Gardner, 377 F.2d 287 (C.A. 4, 1967); Hanes v. Celebrezze, 337 F.2d 209 (C.A. 4, 1964); cf. Berry v. United States, 312 U.S. 450, 61 S.Ct. 637, 85 L.Ed. 945." Walker v. Gardner, 296 F.Supp. 1286, 1290 (E.D. Tenn., 1969).

The Hearing Examiner failed to look at the record as a whole. Watts was employed only because his employer desperately needed a man. Mrs. Watts, who had been supporting the family, was sick, requiring extensive treatment, and unable to work. Plaintiff's financial difficulties were great when he took the job. He was not always able to drive the 20 miles back and forth to his job as the Hearing Examiner found. His duties required little exertion. He "puttered around" and had assistance if anything beyond his capabilities developed.

For the foregoing reasons, the decision of the Secretary is not supported as required by substantial evidence. 42 U.S.C. § 405(g); Rose v. Cohen, 406 F.2d 753 (C.A. 6, 1969); Walters v. Gardner, 397 F.2d 89 (C.A. 6, 1968); Lewis v. Gardner, 396 F.2d 436 (C.A. 6, 1968); Lane v. Gardner, 374 F.2d 612 (C.A. 6, 1967). The decision of the Secretary is reversed.