**Arthur S. FLEMMING, As Secretary of Health, Education and Welfare, Appellant,**

v.

**Hunter Lee BOOKER, Appellee.**

No. 18269.

United States Court of Appeals
Fifth Circuit.

Oct. 25, 1960.

Herbert E. Morris, Samuel D. Slade, Dept. of Justice, Washington, D. C., W. L. Longshore, U. S. Atty., Birmingham, Ala., George Cochran Doub, Asst. Atty. Gen., for appellant.

Chester Austin, Birmingham, Ala., for appellee.

Before RIVES, Chief Judge, and BROWN and WISDOM, Circuit Judges.

RIVES, Chief Judge.

A Referee denied Booker's claim for a period of disability under Section 216(i) (1) of the Social Security Act, 42 U.S. C.A. § 416(i) (1), and for disability insurance benefits under Section 223 of the Act, 42 U.S.C.A. § 423, holding that Booker had not furnished sufficient proof of the existence of his "disability."[1] The

---

1. So far as applies to this case, the definitions of disability in Section 216(i) (1) and in Section 223 are identical. We quote from Section 223(c) (2):

"(2) The term 'disability' means inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

appellant Secretary, through his Office of Appeals Council, denied Booker's request for review of the Referee's decision, and wrote Booker that " * * * the referee's decision stands as the final administrative decision of your claim."

In a review under Section 205(g),[2] the district court reversed the decision of the Secretary, holding that "The evidence supporting the decision of the Secretary is not substantial when viewed in the light that the record in its entirety furnishes." By this appeal we are required to review the judgment of the district court and again to pass upon the identical question of law,[3] i. e., whether the findings of the Secretary are supported by substantial evidence.[4]

Booker appeared as his sole witness before the Referee, and, in addition to his testimony, introduced medical reports from five doctors. We briefly summarize that evidence. Booker was born in 1900. He went to elementary school for eight years, and left school at the age of seventeen or eighteen. When 25 years of age he went to work for the Birmingham Transit Company, and thereafter worked steadily for that Company until he was 56. An examination by his family physician, Dr. C. W. Deaver, then revealed a blood pressure of 220/120, and on January 9, 1957, Dr. Deaver made a detailed report to his employer concluding as follows:

"Diagnoses: 1. Hypertension with albuminuria
2. Psychoneurosis
3. Hypertrophied prostate.

"I believe it would be detrimental to Mr. Booker's health and to the safety of the Birmingham Transit Company for him to continue as a bus operator."

Booker did not work for the Birmingham Transit Company after November of 1956. Since that time, he has not been bedridden or continuously confined to his home, but has driven a car, and has been able to help his wife with the housework to the extent of sweeping the front porch and walk. His wife has been under a doctor's care for 10 or 12 years, and has no earnings. His drug bills run about $20.00 to $30.00 a month. He receives $80.65 as a monthly disability payment from the Transit Company. His children are married and have their own responsibilities, but help their parents to the extent of $10.00 or $12.00 a month. His wife's brother has contributed a total of $500.00, $300.00 of which went to pay for a prostate operation in January of 1956. The only evidence of gainful employment since 1956 was furnished by Booker himself, and since that

---

which can be expected to result in death or to be of long-continued and indefinite duration. An individual shall not be considered to be under a disability unless he furnishes such proof of the existence thereof as may be required."

2. In pertinent part:
   "(g) Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow. * * * As part of its answer the Secretary shall file a certified copy of the transcript of the record including the evidence upon which the findings and decision complained of are based. The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * *. The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions." 42 U.S.C.A. § 405(g).

3. Cf. Marsh v. Illinois Central R. Co., 5 Cir., 1949, 175 F.2d 498, 500.

4. Upon the present record we find it unnecessary to decide whether any presumption of correctness should be accorded to the district court's decision.

is important we quote Booker's testimony on that subject:

"Q. Have you done any work for anybody at any time since November of 1956? A. Yes, Sir. I have got a friend that owns a used car lot, and I hang around there and pick up $15 or $20 a week out of that. I have to have something to try to help pay drug bills, and he is good enough to me to help me out a little bit.

"Q. What does he expect you to do for this $15 or $20 a week? A. Well, I answer the telephone and stay around there when he is gone. I help him in any way that I can.

"Q. Well, do you sell cars? A. I help him. I am no salesman. I have never done anything but streetcar.

"Q. How do you help him sell a car? A. I talk to the folks that come in.

"Q. If two people come in there at once, do you talk to one and he talks to the other? A. Yes, I will talk to one until he gets a chance to get to them.

"Q. If you sell a car before he comes over, do you get anything for that? A. No, I never close a deal. He does the closing of a deal. I never sell a car.

"Q. When did you first start doing this? A. I had been helping him some before I was ever disqualified.

"Q. Do you recall when you first started doing that? Was it a year before you left your job, or six months. A. It was about six months, I presume.

"Q. Six months before you left work? A. Approximately. I don't know the definite time.

"Q. Do you sweep up or dust around the office? A. No, Sir.

"Q. Do you ever drive a car around with a customer in it to show them how it runs? A. Only if he is busy. That is his job.

"Q. But you do it on occasions? A. Yes, on a few occasions.

"Q. Do you do this with new cars? A. No, used cars. It is a small lot.

"Q. How many hours a day does this involve? A. About ten.

"Q. Ten hours a day? A. Yes. I tell you, it's awful—sometimes twelve.

"Q. Is that day time or night time? A. Day time.

"Q. Do you do this every day? A. Yes, Sir, every day I am physically able. Some days I ain't able to get out.

"Q. How many days a week do you work at this used car lot? A. I can't answer that. I never have tried to keep up with it. I am going to doctors at different times.

"Q. Would you say you average about five days a week? A. Yes, about that. Sometimes I am off a week when I am down with this nephritis, but I would put that as an average figure.

"Q. And you make between $15 and $20 a week? A. Yes, Sir.

"Q. Since you have stopped work, have you done anything else for any other person? A. No, Sir. The only reason I could do that is that there isn't any work to it—just sitting around. The doctors won't let me do nothing."

The five doctors, whose statements were submitted by Booker, all agreed subsantially that he suffered from high blood pressure (the readings ranging from 180/120 to 240/130), from psychoneurosis, and from chronic nephritis. Dr. Deaver, his family physician, advised him "not to work." Dr. Young, who operated on him for chronic prostatitis, advised "light work." Dr. Herren, on consultative examination, requested by Alabama's Disability Determination Team, recommended "referral to State Vocational Rehabilitation Service for relocation in non-hazardous work." Dr. Williamson concluded: "In view of the

history and findings, it is our opinion that Mr. Booker is totally and permanently disabled." Dr. Gaines' conclusion was: "In view of the Hypertension and Chronic Nephritis, it is my opinion that he is totally and permanently disabled from pursuing any gainful occupation."

The Referee, found that, "the regularity and continuity of claimant's services in the used car lot during this statutory period makes a finding of inability to engage in gainful work wholly untenable." We do not agree. There is no reason why the rules established by the Supreme Court and by this Circuit in connection with other statutes should not be here applicable. In Berry v. United States, 1941, 312 U.S. 450, 455, 456, 61 S.Ct. 637, 639, 85 L.Ed. 945, Mr. Justice Black, speaking for a unanimous Court, said:

> "It was not necessary that petitioner be bedridden, wholly helpless, or that he should abandon every possible effort to work in order for the jury to find that he was totally and permanently disabled. It cannot be doubted that if petitioner had refrained from trying to do any work at all, and the same evidence of physical impairment which appears in this record had been offered, a jury could have properly found him totally and permanently disabled. And the jury could have found that his efforts to work—all of which sooner or later resulted in failure—were made not because of his ability to work but because of his unwillingness to live a life of idleness, even though totally and permanently disabled within the meaning of his policies."

In Mabry v. Travelers Ins. Co., 5 Cir., 1952, 193 F.2d 497, 498, Judge Holmes, for this Circuit, said:

> "Pinched by poverty, beset by adversity, driven by necessity, one may work to keep the wolf away from the door though not physically able to work; and, under the law in this case, the fact that the woman worked to earn her living did not prevent a jury from finding, from the evidence before it, that she was totally and permanently disabled even while working."

Moreover, the inability must be "to engage in any *substantial* gainful activity" (See n. 1, supra). Booker's total yearly earnings in the used car lot must have been less than $1,000.00, and that does not measure up to the Department's policy as described in a report submitted to the House Committee on Ways and Means by the Subcommittee on the Administration of the Social Security Laws on March 9, 1960:

> "Present Department policy in interpreting the effect of earnings on a finding of 'substantial gainful activity' is found in the confidential manual, which states that if an individual earns over $1,200 a year he is engaging in 'substantial gainful activity' in 'absence of evidence to the contrary.' The binding nature of this guide is shown by the fact that, upon subcommittee request, a survey was undertaken which showed that no disability beneficiary was maintained on the rolls after he demonstrated an earning capacity of more than $1,200 a year in competitive non subsidized employment."

The Referee, in his decision, further stated:

> "The Statute and federal regulations pertinent thereto prescribe the criteria for evaluation: the medical impairment or combination of impairments must be so grave as to be equatable to the loss of use of two limbs. 20 CFR 404.1501 (1958 Supp.)."

The cited regulation does not support the Referee's statement, but simply gives "loss of use of two limbs" as one among many "examples" of inability to engage in any substantial gainful activity. Another part of that regulation states that, "Consideration is also given to such other factors as the individual's education, training and work experience."

■■ We agree with another attempt of the Referee to elaborate upon the statutory definition of "disability" (See n. 1, supra):

" To come within the standard of 'disability' as defined by the Congress, the claimant must be unable to engage in *any* substantial gainful activity, his former or *any other* job or occupation in which he might be employable, taking into consideration his age, training, work experience, and physical and mental capacities (Report of Senate Committee on Finance, Report 1987, 83rd Congress, 2nd Session, p. 20, 21)."

See also, Aaron v. Fleming, D.C.M.D. Ala.E.D., 168 F.Supp. 291.

Measured by that standard and the statutory definitions of disability, we agree with the learned district court that the findings of the Secretary are not supported by substantial evidence. The judgment of the district court is therefore

Affirmed.