**Edward S. BUTLER**

v.

**Arthur S. FLEMMING, Secretary of Department of Health, Education and Welfare.**

**No. 18587.**

United States Court of Appeals Fifth Circuit.

April 5, 1961.

Enoch G. Fletcher, Grand Saline, Tex., for appellant.

Paul N. Brown, U. S. Atty., Tyler, Tex., for appellee.

Before JONES and BROWN, Circuit Judges, and CARSWELL, District Judge.

JOHN R. BROWN, Circuit Judge.

The question here is whether the District Court was correct in holding that there was substantial evidence to support the administrative finding that the Claimant was not totally disabled under the disability freeze provisions of the Social Security Act, 42 U.S.C.A. §§ 416 (i), 423. At every turn the claim was rejected. As permitted under § 205(g), the Claimant sought review of the adverse decision of the Referee which became final on the formal denial by the Appeals Council of the Claimant's Request for Review.

As near as we can discern the Referee's decision, rejection of the claim of disability rested on a combination of several factors. First, the Claimant was ambulatory and not bedridden. Second, he had in prior years earned a considerable amount in self-employment in the operation of one of the two domino parlors in his small Texas city. Third, no doctor had stated that he was positively unable to do any work whatsoever. Finally, the employee must not be totally disabled since he showed great resourcefulness in setting up this small business when he could not obtain employment.

A proper analysis of this record compels, we believe, two conclusions. First, the evidence is really all one way. There is no real dispute. Second, it demonstrates positively that the Claimant is totally disabled within the meaning of the statute.

The Claimant is 55 years of age with but a limited fourth-grade schooling. Previously he had engaged in general heavy labor. In 1943, he sustained a severe injury to his back resulting in "pinched nerve roots and nervousness" as one doctor described it. In 1953 while working for a construction company he again fell and hurt his back. Examination and X-rays demonstrated in 1953 that he had "marked changes in the area of the lumbar spine, with a solid fusion between L 2 and 3 * * *" and " * * multiple bony changes above and below these vertebrae." This caused "pressure on the nerve roots as they emerge from the [spinal] canal." For that injury he was abed for six months, on crutches for another five, and during much of this time his back and legs were paralyzed at least in the sense of his not being able to move them. As a consequence of the cumulative effect of the last injury on his actual pre-existing condition, he suffered a nervous breakdown in 1954. After that time he was unable to return to any heavy jobs.

All of this was confirmed by the medical consultant called in by the Agency to make an impartial study and report to it through the Vocational Rehabilitation Division of the Texas Educational Agency. The doctor who treated him after the 1953 injury and examined him again in 1959 compared the examination and X-rays of 1959 with those of 1953. This comparison showed "that the 2nd and 3rd lumbar vertebrae are still solid. There are marked bony changes noted * * * in fact they have increased over that seen in 1953." The impartial consultant agreed. Concerning this, he reported "unusual changes involving the first and second lumbar vertebrae. These are fused together, and there is some posterior displacement of L1 on L2. There is a total obliteration of the adjacent surfaces of the vertebrae and gives the deduction that some inflammatory process has destroyed the intervertebral discs and adjacent surfaces so that they are fused."

After the 1954 nervous collapse, the Claimant thereafter engaged in no gainful activity save the management and operation of his domino parlor. While it has a beguiling impressiveness to state, as does the Government in its brief, that this was substantial since the income from it aggregated $7,236.53, it amounted to very little on an annual basis.[1] But that does not really matter since it was uncontradicted that in 1958 the pains in his leg and back made performance of even these light managerial and housekeeping tasks unbearable. His earnings for 1958, the critical year, were but $800, see note 1, supra, an amount below the Department's internal administrative policy determination of "substantial gainful activity." [2]

Apart from any administrative minimum, this was neither substantial nor was he able to do this work. Repeated many times but never challenged were the Claimant's positive statements. "I have been running a domino parlor, not because I was able but because I had to. Sometimes my back hurt so badly and I get so nervous that I can bearly stand it." Again he said, "I have been running the domino parlor while in great pain with my back and under great nervous tension. I have done this—not because I was able but because I had to." In answer to a specific departmental inquiry of September 15, 1958, he replied across the bottom of the letter, "I had to quit the domino parlor and [am] unemployed now. I am in such shape that I can't do any

manual labor. I have made about $400 this year * * *." When he could no longer even undertake those simple tasks, he sold this business—presumably dominoes, table and all—for $250.

This medical history and diagnosis was uncontradicted as was the evidence concerning the Claimant's pain and his actual inability to carry on any work. The Referee apparently thought, however, that this had to be measured against a stringent congressional policy requiring exacting proof from all such claimants. When so done, he reasoned that since inability to work is largely a medical question, the medical evidence, though portraying a man in awful shape, was inadequate. It was inadequate because it did not declare that the Claimant was unfit for every conceivable kind of job.

There are two fundamental errors in this. One is a mistaken view of a legal standard, or at any rate its application. The other is a mistake in the evaluation of this uncontradicted medical evidence.[3]

Of the three doctors who made reports, not one of them asserted the professional opinion that the Claimant was able to work. Dr. Garland, a local physician who knew him best, had long treated him and had seen him undergo the 1954 nervous breakdown. He prefaced his conclusion in this way. "Each time after the two [1943 and 1953] injuries, when he starts to work, his back and leg gives so much pain and distress it puts him

1. The earnings, all from self-employment, were tabulated as follows:

| | |
|---|---|
| 1954 | $1,803.08 |
| 1955 | 1,581.45 |
| 1956 | 1,372.00 |
| 1957 | 1,677.00 |
| 1958 | 800.00 |

2. This is set out in Flemming v. Booker, 5 Cir., 1960, 283 F.2d 321, 324. The confidential manual regards $1200 or more as "substantial."

3. The medical "evidence" was, of course, signed medical reports. Much of the non-medical factual data was in the form of letters from the Claimant and others corroborating his statements. With the staggering administrative problem of processing the thousands of cases by the Department, it must be recognized, as Judge Friendly so ably pointed out for the Second Circuit in Kerner v. Flemming, 2 Cir., 1960, 283 F.2d 916, 922, and notes 9 and 10, that courts have no right to expect that these records will come up with the imposing attributes of court or other administrative proceedings. Indeed, assistance by counsel is virtually an act of professional public service in view of the severe restrictions as to attorney's fees. In the absence of special application and order, 20 CFR § 403.713(d), Regulation No. 3, fixes the fee at $10. Collection of a fee in excess of the maximum has criminal sanctions under § 206, 42 U.S.C.A. § 406.

to bed." He then declared that in "my opinion" the Claimant "is unable to do hard work, and will probably never be able to do anything that will require him to strain, lift or do any excess[ive] amount of walking." Dr. Knight, an orthopedic surgeon of Dallas who had treated him after the 1953 injuries, introduced his medical opinion by this unrefuted fact. The Claimant's "history since [1953] reveals that he has worked only in a pool hall but this has been with difficulty. He has had pain in the back and legs, especially the right which at times gives way on him. He can be walking along and will almost fall." His final and formal medical opinion pictured a man unable to work with safety either to himself or his fellow workers. "It is my opinion that [Claimant] is unable to do hard work, perhaps nothing more than night watchman's job or something similar. If it continues to bother him (since he definitely has nerve root pressure) it will be difficult for him to get around and he is prone to falling and re-injuring himself." Dr. Galt, the impartial medical consultant, in his diagnosis No. 3 of "Injury and destruction of 1st and 2nd lumbar vertebrae with previous injury of nerve filaments" then made this conclusion. "Whereas this does not appear to be incapacitating at this time, it would render him unemployable if examination were required."

Where in this medical picture is there any basis for concluding that this man is capable of engaging in work for which he is suited by his experience? Hardly in the conclusion of Dr. Galt. This was medical jargon for the discouraging certainty that if he applied for employment at a business which had pre-employment physical examinations, he would be rejected for medical reasons and not get a job. Dr. Knight expresses, at most, a tentative view that he might do "perhaps nothing more than a night watchman's job." But proving Dr. Galt's estimate of probable industrial action to be correct, the effort of the Claimant through his son to obtain night watchman's work failed. This attempt, he testified, failed because such employers advised that they were turning men away in better shape than Claimant. Dr. Garland, who knew him best, ruled out any "hard work" or any work requiring him to "strain, lift or do any excess[ive] amount of walking."

About all that is left is the suggestion made in the Referee's decision that this did not rule out the possibility of the Claimant doing sedentary work. Just what sort of sedentary work within the experience and capability of this man of limited formal education was available—either locally or anywhere else—does not appear. As dominoes is hardly a game of vigorous activity either on the part of its meditative participants or those who husband the operation of the game and its minimal facilities, this would seem to come under the heading of sedentary. Unfortunately, he could not do even that.

These medical-economic-physical facts, all of which are essentially undisputed, fit the legal standard which has been variously phrased. Judge Rives, sitting as a District Judge, stated it this way. "I do not interpret the Act to apply only to the totally helpless and bedridden nor to those at death's door. If a wage earner has the inability to engage in 'any substantial gainful work' which is commensurate with his education, training, experience, and physical and mental capacities, then he should be given the benefit of the 'disability freeze.'" Aaron v. Fleming, D.C.M.D.Ala.E.D.1958, 168 F. Supp. 291, 295. Citing our recent case of Flemming v. Booker, 5 Cir., 1960, 283 F.2d 321, in support of the general standard expressed in the last sentence just quoted, Judge Friendly for the Second Circuit in Kerner, see note 3, supra, translates this as a practical matter into "a determination * * * of two issues—what can applicant do, and what employment opportunities are there for a man who can do only what applicant can do?" Agreeing with Aaron, the Second Circuit goes on, "Mere theoretical ability to engage in substantial gainful activity is not enough if no reasonable opportunity for this is available, Aaron

v. Fleming * * *." 283 F.2d at page 921.

If, as suggested in the Government's brief, Hallard v. Fleming, D.C.W.D.Ark. 1958, 167 F.Supp. 205, and Judge Learned Hand's statements in Theberge v. United States, 2 Cir., 1937, 87 F.2d 697, 698, concerning a different statute enacted for a different policy in a different era, are to stand for the proposition that pain, no matter how severe, is not disabling unless work does "more than hurt" so that it "substantially aggravate[s] his malady," 87 F.2d at page 698, we regard them as contrary to the standard announced in Booker and Kerner and many others like them. Perhaps it is true that history teaches that "A man may have to endure discomfort or pain and not be totally disabled; much of the best work of life goes on under such disabilities * *." But the purpose of much social security legislation is to ameliorate some of these rigors that life imposes. Congress has in effect stated that if a person is unable except under great pain to engage in any substantial gainful activity in which he might be employable, taking into consideration his age, training, work experience and physical and mental capacities, he shall be deemed to be disabled for the purposes of this Act.

If there was any work which this Claimant was able to perform, the record fails to disclose it. We do not mean by that to suggest that the formal burden is on the Government to make any such specific showing since the statute puts the general burden on the claimant. But in the context of this Act and the manner in which, out of necessity, it has to be administered with much informality and in great volume, satisfaction of the claimant's statutory obligation is to be judged in a practical way. Kerner v. Flemming, 2 Cir., 1960, 283 F.2d 916, 921-922. Considering the background, experience, training, education, physical and mental capabilities of the Claimant, the kinds and types of employment formerly followed and no longer open to him, the absence of any indication of any specific work less exacting within his residual competency and reasonably available as a prospective source of employment in the general area where he lives, this record satisfies that test. When the Claimant could no longer even shuffle dominoes, he was not required by the use of a catalogue of the nation's industrial occupations to go down the list and verbally negative his capacity for each of them or their availability to him as an actual opportunity for employment.

Reversed and rendered.