**Laura A. MOSEY, Plaintiff,**

v.

**Joseph A. CALIFANO, Jr., Secretary of Health, Education and Welfare, Defendant.**

**Civ. A. No. 79–667N.**

United States District Court,
W. D. Pennsylvania.

April 12, 1980.

Terrence E. Tomassetti, Blair County Legal Services, Altoona, Pa., for plaintiff.

John P. Panneton, Asst. U. S. Atty., Pittsburgh, Pa., for defendant.

SUPPLEMENTAL MEMORANDUM

ROSENBERG, District Judge.

Laura M. Mosey, the plaintiff, filed this appeal from the decision of Joseph A. Califano, Jr., Secretary of Health, Education and Welfare, after a line of appropriate administrative procedure. The facts of this case are well recited by United States Magistrate Ila Jeanne Sensenich to whom the case was originally referred for inquiry, Report and Recommendation. The Magistrate filed her Report and Recommendation and provided sufficient notice to the parties to file objections to such report and recommendation. None were filed.

In the Magistrate's report and recommendation, she states that the Administrative Law Judge failed to give his reasons for finding that the plaintiff could return to certain jobs "in light of Dr. Crider's report . . . ." She suggested that a more detailed analysis appears to be required by the Court of Appeals. *Baerga v. Richardson*, 500 F.2d 309, C.A.3, 1974. Furthermore, she notes that the Administrative Law Judge failed to make any finding as to the plaintiff's credibility as required by *Kephart v. Richardson*, 505 F.2d 1085, 1089–1090, C.A.3, 1974. She notes additionally that the Administrative Law Judge "made no finding that she suffered from diffuse degenerative disc disease of the lumbar spine although this diagnosis was well documented by X-rays. (Tr. 207, 214, 124, 248)." She indicates that he made no finding that "she suffered from chronic irritable bladder syndrome (Tr.124), anxiety neurosis (Tr. 129), spastic bowel syndrome (Tr. 129), and obsessive compulsive phobic reaction (Tr. 237)." She concludes properly that since these matters were not included in his findings nor did he give any reasons in his discussion, that much is left by the Administrative Law Judge to speculation.

It is unnecessary that I detail the numerous physical ailments and difficulties that the plaintiff underwent in the past many years and the number of doctors she had consulted and from whom she had had treatment, as well as the hospitalizations that she required for help insofar as all her ailments were concerned. In addition to the variety of physical ailments that she suffered, she also suffered the fear of going outside her home, and that this started in 1959 and had continued up to the time of the hearing on April 11, 1978; that her fear kept getting worse and worse; that she testified that she had been treated by Dr. Richard Clark, a psychiatrist who had since died; that his treatment helped her some but that she wanted to get over her problem completely; that she had been unable to get her medical records from Dr. Clark's estate, and that she saw several doctors regarding her phobia and that the other doctors did not believe her. She testified also that she had not been able to afford another psychiatrist.

The Magistrate also discussed the testimony of Dr. Kenneth F. Rhodes, a psychologist and Dr. Donald B. Crider, a psychiatrist. While the record indicates that the psychologist's report is not too clear, it is obvious that he concluded that the plaintiff demonstrated average intellectual abilities accompanied by acceptable academic achievement patterns with no severe evidence of psychological impairment, and that her social contacts were within the acceptable range. The psychiatrist, Dr. Crider, would not be committed to an opinion because he said the plaintiff's fears could not be documented by a psychiatric interview only. He did indicate from what he had gathered from her statements and those corroborated by her husband, that she suffered from "obsessive compulsive phobic reaction". Thus she appeared to be severely functionally impaired. The inference to be drawn from Dr. Crider's testimony seems to be that a series of psychiatric examinations or more attentive examination is required in order to determine the character and degree of phobic incompetence, if any such exists.

The Administrative Law Judge concluded, nevertheless, that the plaintiff could perform duties of her usual occupations and therefore is not entitled to supplemental security income. The Appeals Council and the Secretary affirmed and that decision was appealed to this court.

It is unnecessary that I discuss the judicial capabilities of the Secretary, or the limited jurisdiction of the district court to any determinations as made by the Secretary, but it is incumbent upon a district court in a case like this to note that the statute provides for the character and kind of basis upon which a plaintiff may make a claim as did the plaintiff in this case.

Within the meaning of the term "disability", the statute provides that

"(A) inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ." 42 U.S.C. § 423(d)(1).

Furthermore, the statute provides that "a 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

■ Thus, we see that not only physical but mental or psychological abnormalities come within impairment or disability for which Congress provided.

While this plaintiff testified to a long list of physical problems, that she has had hospitalization at the Altoona Hospital from February 17 to March 6, 1976 and before that from August 24 to September 10, 1966, her phobic manifestations commenced in 1959 to such an extent that she has for a long time been unable to walk outside the house and has a fear of leaving the house. It was that which then interfered with her ability for gainful employment as a waitress, her latest and evidently last outside employment.

The words in the statute ". . . any medically determinable . . . mental impairment . . ." recognize what we all know as painful affliction in varying degrees which may be brought on by fear, apprehensions, fright, and different characterizations of mental anguish. The statute unquestionably includes phobic manifestations and their resultant afflictions. Much of the physical manifestations are supported by the testimony of various doctors. However, since there is no actual contradiction in her testimony, other than the fact that the various doctors in other specialities could not verify or corroborate her phobia to which she testified, if such exists, it is her own testimony and her husband's testimony which stands in a sense, but in reality not contradicted.

The psychologist's testimony superficially from his examination of the plaintiff dealt only with the plaintiff's personal mental manifestations, since psychology deals only with the science of the mind or mental phenomena and its activities, as well as mental processes or behavior. Webster's Third New International Dictionary, Unabridged, 1971, at page 1833. It is the psychiatrist's conclusions and opinions with which the Administrative Law Judge should have dealt and given serious consideration to its medical impact, since psychiatry is a "branch of medicine that deals with the science and practice of treating mental, emotional or behavioral disorders especially as originating in endogenous causes . ." Webster's Third New International Dictionary, Unabridged, page 1832. Psychiatry is "that branch of medicine which deals with disorders of the psyche." Dorland's Illustrated Dictionary, 1961, at page 1127. Thus it is noticeable that the psychologist is not a medical doctor as is a psychiatrist as required by Pennsylvania law. It is the medical opinion with which the Administrative Law Judge should be concerned as it relates to physical or emotional pain.

■ While it is within the realm of the Administrative Law Judge to determine credibility, such credibility must be basic and the determination of the Secretary in such an action must be sustained if it is supported by substantial evidence. However, such substantial evidence requires that the Secretary's decision be founded on more than a mere scintilla of evidence and must be based on relevant evidence which a reasonable mind might consider adequate to support the conclusion. *Memoli v. Califano,*

463 F.Supp. 578 (S.D.N.Y.1978). Furthermore, the Secretary's determination cannot disregard the evidence, and if a determination is made, the Secretary must give reasons for his decision based upon adequate evidence which supports his conclusion. *Smith v. Califano*, 592 F.2d 1235, C.A.4, 1979. This latest requirement confirms what the United States Magistrate has already indicated in her report and recommendation.

In a previous case I was called upon to consider pain as a possible cause for disability for substantial gainful employment. *Lightcap v. Celebrezze*, 214 F.Supp. 209 (W.D.Pa.1962). I then inquired into the character of pain as asserted and questioned whether it was real, emotional or malingering. I stated that objective evidence should have been available through medical experts and presented as evidence. *Lightcap, supra*, at page 215.

The question of malingering has not been raised here and is therefore neither a matter for the Administrative Law Judge nor this court on appeal. That the plaintiff suffered real physical pain is obvious from the series of spinal ailments, surgery and resulting hospitalization with the attendant medical care which she required. It is logical that a person so suffering from physical being or existence, might have also become emotionally disturbed with the potential for emotional pain. The evidence does not clarify whether or not her phobic affliction came before her physical ailments and disabilities, but whether it did or not, it would not matter much because it is obvious to a person of ordinary common sense that the physical manifestations of pain, as this patient suffered them and detailed them, would aggravate her emotional condition.

Most people to some extent suffer from some form of phobia like superstition, and with this we are all acquainted by reason of the publicity given to the bad luck when a black cat runs in front of a person, Friday the 13th as a day of which one must be wary, the breaking mirror causing bad luck, walking under a ladder as bringing misfortune, and others with which we are commonly familiar. All these are fears which clutch at a victim with varying degrees of minor agitation to even the severest suffering. This is common knowledge and we need no authority to support these as facts. What the plaintiff in this case testified to as an abnormal fear, frequently reported by other similar sufferers, appears to be not at all unreasonable, as such was corroborated by another witness or two. In any event, there is no substantive medical evidence in the record which in reality contradicts the plaintiff's testimony or deprives it of credibility. Under these circumstances, it should not have been a matter of disbelief by the Administrative Law Judge and sufficient discredit in itself to the plaintiff's evidence.

The law is well settled on the characterization of pain as this relates to ability to perform gainful employment. Brief excerpts of various opinions in these cases are appropriately here set forth.

" . . . if a person is unable except under great pain to engage in any substantial gainful activity in which he might be employable, taking onto consideration his age, training, work, experience, and physical and mental capacities, he is deemed disabled for purposes of the Social Security Act." *Butler v. Flemming*, 288 F.2d 591, 595, C.A.5, 1961, cited also in *Smith v. Celebrezze*, 229 F.Supp. 827 (D.C.N.D.1964).

"[E]ven pain unaccompanied by any objectively observable symptoms which is nevertheless real to the sufferer and so intense as to be disabling will support a claim for disability benefits." *Ber v. Celebrezze*, 332 F.2d 293, 299, C.A.2, 1964.

"The fact that there is such a subjective symptom as pain of claimant for social security benefits does not mean that it ranks as a lesser type of disability." *Blanscet v. Ribicoff*, 201 F.Supp. 257, 261 (D.C.Ark.1962).

"This notion that pain must be endured, that pain, no matter how severe or overpowering, is not disabling unless it will 'substantially aggravate' a condition, is contrary to law under disability provisions of the Social Security Act which

were intended to ameliorate some of the rigors that life imposes." *Page v. Celebrezze*, 311 F.2d 757, 762, C.A.5, 1963. "Pain was brushed aside as a subjective non-entity. Well reasoned opinions and the obvious purposes of the Act compel that great consideration be accorded to that merciless entity called 'pain'. The fact that some extra-ordinary individuals can bear it and perform unflinchingly does not mean that such heroics is the 'standard'. The criterion is not even the standard of the ordinary man or the average man; the standard is the individual claimant himself, with all his personal assets and liabilities." *Drafts v. Celebrezze*, 240 F.Supp. 535, 538 (D.C.D.C. 1965).

■ Emotional pain can disable a person from substantial gainful employment within the meaning of the disability provisions of the Social Security Act. *Lightcap, supra*, p. 215. Because physical and emotional pain may be as real as to disable a person from the performance of gainful employment under the Act, it was incumbent upon the Administrative Law Judge to make findings of such fact from the substantial evidence before him. This he failed to do.

From the evidence as presented by the plaintiff here, it would seem to me, but not as the one charged with making a determination of that fact, that the plaintiff had presented sufficient evidence to substantiate her claim. In any event, I repeat what I said in *Lightcap, supra*, at pages 215–216.

"In this day of scientific and medical achievement, there are numerous medical experts in the field who may examine and test a complaining person objectively and determine with reasonable accuracy the reality and genuineness of a person's subjective complaints, and as well, if any pain exists, its character and extent. (footnote omitted) Although as between organic and emotional pain, certain instances may not be tested to determine which may be causing the pain, nevertheless, the pain in both may be as real and as disabling."

In examining the Secretary's record in this case, the United States Magistrate acted basically and judicially in making her determination.

Judge Kalodner in *Goldman, Administrator of the Estate of Goldman v. Folsom*, 246 F.2d 776, 778, C.A.3, 1957; *Lightcap, supra*, at page 216, said:

" 'In discharging that duty we must keep in mind, as adjured by the Supreme Court, that "courts must now assume more responsibility for the reasonableness and fairness" of decisions of federal agencies "then some courts have shown in the past" and "Reviewing courts must be influenced by a feeling that they are not to abdicate the conventional judicial function." *Universal Camera Corp. v. National Labor Relations Board*, 1951, 340 U.S. 474 [475], 490, 71 S.Ct. 456, 466, 95 L.Ed. 456.' "

That the plaintiff in this case suffers from a phobic abnormality is unquestioned. Since the plaintiff's testimony must be credibly accepted because there is no substantial contradictory evidence, her phobia (agoraphobia) is indeed a disability which prevents her from leaving the house and so further prevents her from performing any work similar to that which she had been accustomed to doing in her various places of employment as gainful employment. While it is true that she is able to do housework, that does not necessarily indicate that she is able to perform gainful employment outside the house.

There is one matter which presents a disturbing void in all of this case as it comes here on appeal. If it is true that the plaintiff could not perform any gainful employment outside of the house as prevented by her affliction of agoraphobia, is it a foregone conclusion also that she cannot perform any gainful employment inside the house, if the agoraphobia does not interfere? In other words, no evidence appears in this record other than that she has been able to perform housework. Should not the Administrative Law Judge have heard the plaintiff's version of whether or not she could perform gainful employment inside

the house, and should not the vocational expert have presented evidence of the kinds and quantity of work that the plaintiff might have been able to perform inside the house without leaving it? We see publicity on occasion of help wanted for home addressing, home telephoning, home sewing and the like. Here it would seem that the physical condition, because of the afflictions which the plaintiff suffers and perhaps even that together with a stressful inhibition produced by agoraphobia, might prevent or might not prevent the plaintiff from performing gainful employment within the home. Accordingly, I add this to the recommendation of the United States Magistrate for the consideration of the Administrative Law Judge and for an appropriate determination based upon evidence, both as to the plaintiff's physical nature and what medical aspects are related thereto.

It may be legally concluded that with her physical accumulation of ailments and physical disturbances, the mental impairment which she has suffered from 1959 will continue into the future, unless it can be separated from her physical ailments by proper and appropriate professional therapy.

Under such circumstances we are left with surmise from the total decision of the Secretary. In addition to that which the United States Magistrate has suggested is necessary in order to provide clarity to support the Secretary's decision, it would seem that appropriate professional testimony would be required regarding the capability or inability of the plaintiff to perform gainful employment as specified under the statute.

Accordingly, the Report and Recommendation of the United States Magistrate dated February 29, 1980 is adopted as the Opinion of this Court and as it is supplemented by this Memorandum.

## ORDER OF COURT

AND NOW, TO–WIT, this 12th day of April 1980, IT IS ORDERED that the defendant's Motion for Summary Judgment

be and the same is hereby denied; and that this case be, and it is hereby remanded to the Secretary of Health, Education and Welfare for reconsideration in accordance with the Report and Recommendation of the United States Magistrate and this Supplemental Memorandum.

## MAGISTRATE'S REPORT AND RECOMMENDATION

ILA JEANNE SENSENICH, Magistrate.

## I. RECOMMENDATION

It is recommended that plaintiff's Motion for Summary Judgment be denied, that defendant's Motion for Summary Judgment be denied, and that the action be remanded to the Secretary for reconsideration.

## II. REPORT

This is an action timely filed under 42 U.S.C. Section 1383(c)(3) to review a final decision of the Secretary of the Department of Health, Education and Welfare, denying plaintiff's application for supplemental security income benefits.

The issue in the present appeal is whether there is substantial evidence to support the findings upon which the Secretary based his conclusion that plaintiff is not totally and permanently disabled due to an obsessive compulsive phobic reaction manifesting itself in fear of leaving her home, diffuse degenerative disc disease of the lumbar spine, chronic irritable bladder, spastic bowel syndrome, anxiety neurosis, diabetes mellitus, chronic urethral obstruction, and cystitis.[1]

Plaintiff was born on June 17, 1922, is 57 years of age, and is married. She graduated from high school and her prior employment included working as a shoe salesman, working in a shoe factory putting leather on heels by hand, working on the railroad for two years as a hooker on a crane and in the car shop, working in a suit factory, cutting out collars, working as a bar maid and as a waitress. Her last employment in September of 1959 was as a waitress. Dur-

---

1. 42 U.S.C. Section 1383(c)(3); 405(g).

ing the hearing on April 11, 1978, she testified that it was while she was working as a waitress that she developed her primary impairment—her fear of going out of the house (Tr. 40). The easiest job she had was cutting collars in a suit factory. However, she had to stand to do that job. She was no longer able to stand for any length of time because she would get pains in the lower part of her stomach and down one leg (Tr. 43).

During the hearing on April 11, 1978, plaintiff testified that her primary impairments were polyps on her bladder, a kidney infection, and her fear of going outside her home. When she has to go out she shakes while dressing, her ears get clogged, her vision is impaired, her legs become weak, and her stomach quivers (Tr. 45–46). One time she tried to go to the store with her husband but he had to turn the car around and take her back home. This started in 1959. Her daughter was in first grade. She went to get her at school and got dizzy and her ears clogged. Her fear kept getting worse and worse. She had been treated for this by Dr. Richard Clark, a psychiatrist who had since died, from 1960 to 1968. (Tr. 40–41) His treatment helped her some but she wanted to get over her problem completely. She had been unable to get her medical records from Dr. Clark's estate. She saw several doctors who told her she was suffering from anxiety and gave her medications which did not help (Tr. 42). At one point she testified that although Dr. Clark had treated her for her fear of going outside the other doctors called it anxiety and did not seem to believe her (Tr. 46). She does not like staying in the house all the time but has no other choice. She has no social life (Tr. 51, 47). This problem developed around the time she was going through menopause. She is afraid to walk outside the house. Her husband had to bring the car near the house to get her to the hearing (Tr. 49). Her husband takes the clothes to the laundromat (Tr. 50). He takes her to the doctor and she shakes the whole time. At the time of the hearing she reported that she was going to try a new doctor (Tr. 51). She did not feel she could work because of her fear of going out of the house (Tr. 52). She had not been able to afford to see another psychiatrist since Dr. Clark (Tr. 53).

Plaintiff testified that she had arthritis in her lower spine. When she stands for about an hour her left leg swells and goes numb. She has to lie down and put her leg up on a pillow (Tr. 48). When she sits too long she gets tingles in her left leg. She was experiencing this during the hearing after sitting for one hour and 15 minutes. If she gets up and shakes her leg she can sit back down but she usually tries to lie down. She can wash and care for herself but she waits until her husband comes home before she gets in the tub. When she tries to lift an object like a bag of potatoes from the floor to the table, she gets terrible pains in the bladder (Tr. 49). She can extend her arms and hands above her head. She can wash the dishes although sometimes she has to stand on one leg so the other one will not swell so much. She does the cooking but can't run the sweeper because of her back pain (Tr. 50). She testified that she was no longer able to do her housework or perform her wifely duties (Tr. 43–44). She was being treated for diabetes but was not taking insulin (Tr. 44). She was on a diet which seemed to have gotten her diabetes under control. She was taking valium and vitamycin for her bladder. On an average day she gets up, has breakfast, takes her medication, and lies down. She washes the dishes, rests, cleans the house, and rests again (Tr. 51). She reads newspapers, magazines, and watches television (Tr. 37). At the time of the hearing she was five foot two inches tall and weighed 169 pounds (Tr. 38).

Plaintiff's husband testified that he did all the housework and washing. When she went to see Dr. Clark he had to carry her out to the car. He frequently comes home from work and finds her crying (Tr. 54). When he is at work he worries about her. This all started in 1959. They got along well but were unable to have sexual relations (Tr. 55).

The earliest medical report is by Dr. Julius C. Rosch, a specialist in internal medicine and cardiovascular diseases (Tr. 121). Plaintiff was obese and complained of tiredness. Dr. Rosch recommended loss of weight and plaintiff did lose weight. He had not seen her since that time (Tr. 120).

Plaintiff was hospitalized at the Altoona Hospital from August 24 to September 10, 1966 (Tr. 177). Unfortunately, the summary sheet is not legible (Tr. 177). However, she had been admitted with severe mid-epigastric pain. During that hospitalization she underwent a cholecystectomy and the resulting diagnosis was acute cholecystitis and cholelithiasia (Tr. 183). On October 20, 1974, the doctor reported that he had seen plaintiff twice in 1971 and once in 1972 and his diagnosis was chronic anxiety neurosis (Tr. 118).

On September 8, 1975, Dr. James P. Herberg, a specialist in general practice (Tr. 117), reported that he had first seen plaintiff on January 20, 1969, with menopausal complaints. She was obese and was placed on a reducing diet. Routine checkups revealed that she was responding but the anxiety and menopausal symptoms persisted. Hormone therapy gave her relief for several months but at times she would become agitated with many somatic complaints. In November of 1969 she was treated for urinary tract symptoms. In February of 1970 she was treated for bronchitis. She was not seen from March 1970 to May 21, 1975, when she returned with menopause symptoms. Complete physical exam and pap test failed to reveal any abnormalities. Dr. Herberg last saw her on July 14, 1975, when she was complaining of pressure in the pelvis region. His diagnoses were menopausal syndrome and recurrent urinary tract infection. She had a fair response to treatment of her menopausal symptoms and anxiety with hormone ingestion and valium (Tr. 113).

Plaintiff was hospitalized at the Altoona Hospital from February 17 to March 6, 1976 (Tr. 206). Final diagnoses on discharge were anterior urethral polyps, acute upper respiratory infection, diffuse degenerative disc disease of the lumbar spine, and left lower quadrant abdominal pain, etiology undetermined (Tr. 207). She had undergone a cysto operation on February 19 and the diagnosis was urethral polyps (Tr. 210). On March 16, 1976, Dr. Luzansky reported that x-rays had revealed diffuse degenerative disc disease of the lumbar spine. The diagnoses were the same as given in the discharge summary from the hospital (Tr. 125, 207).

On March 30, 1976, Dr. John W. Stoker, a specialist in obstetrics and gynecology (Tr. 130), reported that he had treated plaintiff on January 29, 1976, for difficulty voiding and on October 30, 1975, had referred her to Dr. Herberg for her complaints of infection in the bladder, pain in the back, shakiness and nervousness, urinary stress incontinence, and dysparerunia. His diagnoses were anxiety neurosis, chronic cysto-urethritis, and spastic bowel syndrome (Tr. 129).

On April 11, 1977, a doctor, apparently Dr. Johannes DeKoning, a specialist in general practice (Tr. 205), reported a diagnosis of uncontrolled diabetes rendering plaintiff not employable (Tr. 204). On June 8, 1977, a representative of the social security administration called Dr. DeKoning who had seen plaintiff that day. His diagnosis was diabetes mellitus. Dr. DeKoning had no evidence of any psychiatric problem. Plaintiff could relate well and exhibited no mental abnormalities (Tr. 166). On June 14, 1977, a doctor, apparently Dr. Fabrini, reported that plaintiff's vision was 20/20 with correction (Tr. 199).

Plaintiff's hearing before the Administrative Law Judge was held on April 11, 1978. Less than two weeks later, on April 21, 1978, she was readmitted to Mercy Hospital in Altoona complaining of chest pain and dizziness (Tr. 241). X-rays revealed degenerative disc disease about the lower lumbar spine and noted spasm about the gastric antrum and bulb possibly peptic in nature (Tr. 248). On May 1, 1978, she had a hysterectomy (Tr. 255). Subsequent to the hearing Judge DiCenzo decided additional medical examinations and tests were advisable for a proper evaluation of plaintiff's

claim (Tr. 25). Therefore, arrangements were made for her to be examined by Kenneth F. Rhodes, a psychologist, and Dr. Donald B. Crider, a psychiatrist (Tr. 237).

Mr. Rhodes, the psychologist, examined plaintiff on May 24 and 25, 1978, in her home (Tr. 223). The IQ test revealed plaintiff's IQ to be 107, in the average or normal intellectual range. The test suggested plaintiff had the ability to enter into average educational or vocational developmental programs "where her emotional behaviorisms were accepted," an extremely ambiguous limitation (Tr. 224). An achievement test reflected reasonable abilities to interact successfully in society (Tr. 225). The Gestalt test suggested that plaintiff's ability to interact with her social contacts was acceptable (Tr. 227). The psychologist's report and summary are difficult to understand, an apparent result either of his inability to express himself grammatically or inability of the transcriber accurately to transcribe his report (Tr. 235, 236). However, he concluded that plaintiff demonstrated average intellectual abilities accompanied by acceptable academic achievement patterns for an individual who was not employed. She reflected the ability to react to society with acceptable actions and emotions. Mr. Rhodes found no severe evidence of psychological impairment (Tr. 236).

Dr. Crider evaluated plaintiff on September 1, 1978. Unfortunately, the doctor's report is not particularly helpful. He commented that actual documentation of plaintiff's fears could not be made by a psychiatric interview. He noted that plaintiff had not sought help for her psychiatric problem in the past few years. She was generally alert and self-care appeared to be normal. There was no evidence of delusions, misperceptions, or hallucinations. She was well oriented, her memory appeared to be intact, and her fund of information and intelligence were normal. His diagnosis, based on inferences from plaintiff's statements which were corroborated by her husband, was that of obsessive compulsive phobic reaction. She appeared to be severely functionally impaired (Tr. 237). Dr. Crider also completed an evaluation form in which he indicated that plaintiff had a moderately severe restriction of daily activities, constriction of interests, limitation on her ability to perform work requiring frequent contact with others, to perform simple tasks, and to perform repetitive tasks. A moderately severe impairment is one which seriously affects her ability to function (Tr. 238). She had a moderate impairment of her ability to relate to other people, to perform work where contact with others would be minimal, to perform complex tasks, and to perform varied tasks. She had a mild limitation of ability to comprehend and follow instructions and no deterioration in personal habits (Tr. 238).

Judge DiCenzo reviewed the evidence and determined that plaintiff could perform the duties of her usual occupations and therefore she was not entitled to supplemental security income (Tr. 21). The Appeals Council denied plaintiff's request for review (Tr. 11).

Review of the record of this case is extremely difficult. Judge DiCenzo followed the mandate of the Court of Appeals for the Third Circuit which requires him to develop the record for a *pro se* litigant, *Livingston v. Califano*, 614 F.2d 342 (3d Cir. 1980); *Dobrowolsky v. Califano*, 606 F.2d 403 (3d Cir. 1979), and obtained both psychological and psychiatric evaluations of plaintiff. The report of Mr. Rhodes, the psychologist, clearly supports the judge's finding that plaintiff had no psychiatric disorder. However, the report of Dr. Crider is ambiguous. While he indicated that documentation of plaintiff's fears could not be made by a psychiatric interview and that she was well oriented, her memory appeared to be intact, her fund of information and intelligence were normal, and there was no evidence of delusions, misperceptions, or hallucinations, his diagnosis was obsessive compulsive phobic reaction and he expressed his opinion that plaintiff appeared to be severely functionally impaired (Tr. 237). Further, his completion of the evaluation of her impairment raises serious questions as to her ability to return to any of her former jobs (Tr. 238), particularly the

moderately severe limitation of her ability to perform work requiring frequent contact with others, to perform simple tasks, and to perform repetitive tasks. These impairments would clearly appear to affect her ability to work as a shoe salesman, work in a shoe factory, in a suit factory, as a bar maid, and as a waitress. Her age, together with her degenerative disc disease would appear to limit her ability to work for the railroad as a hooker on a crane and in the car shop. However, the judge failed to give his reasons for finding plaintiff could return to these jobs in light of Dr. Crider's report. It is noted that Dr. Crider was selected by the Social Security Administration for plaintiff's psychiatric examination. A more detailed analysis appears to be required by the Court of Appeals, *Baerga v. Richardson*, 500 F.2d 309 (3d Cir. 1974).

Judge DiCenzo failed to make any finding as to plaintiff's credibility as required by *Kephart v. Richardson*, 505 F.2d 1085, 1089–1090 (3d Cir. 1974). Plaintiff's testimony was compelling and it is hard to imagine how she could perform substantial gainful activity if her testimony of fear of leaving the house was true. Plaintiff testified that the easiest job she had held was cutting collars. However, to perform that job she had to stand and she was unable to do that any more. In addition, she was unable to sit too long. In his questioning Judge DiCenzo failed to ask plaintiff to describe her various types of work and to find out whether they permitted her to alternate between sitting and standing. However, the jobs of waitress and bar maid would appear to require substantial standing and substantial ability to relate to other people. The judge found that plaintiff's impairments were chronic urethal obstruction, cystitis and diabetes mellitus. He made no finding that she suffered from diffuse degenerative disc disease of the lumbar spine although this diagnosis was well documented by x-rays (Tr. 207, 214, 124, 248). Further, he made no finding that she suffered from chronic irritable bladder syndrome (Tr. 124), anxiety neurosis (Tr. 129), spastic bowel syndrome (Tr. 129), and obsessive compulsive phobic reaction (Tr.

237). He may have had a valid basis for failing to include these impairments in his findings but since he did not discuss his reasons, this court is left with speculation. Since the record fails to reveal the basis for Judge DiCenzo's findings, it is recommended that the parties' Motions for Summary Judgment be denied and that the action be remanded to the Secretary for reconsideration.

In accordance with the Magistrates Act, 28 U.S.C. Section 636(b)(1)(B) and (C), and Rule 4 of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this report and recommendation.